## IN THE SUPREME COURT OF MISSISSIPPI
### NO. 94-DP-01016-SCT

*CHARLES RAY CRAWFORD*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/23/94 |
| TRIAL JUDGE: | HON. R. KENNETH COLEMAN |
| COURT FROM WHICH APPEALED: | TIPPAH COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | DAVID O. BELL |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LESLIE S. LEE |
| DISTRICT ATTORNEY: | JIM HOOD |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY (DIRECT APPEAL) |
| DISPOSITION: | AFFIRMED - 03/12/98 |
| MOTION FOR REHEARING FILED: | 3/26/98 |
| MANDATE ISSUED: | 6/25/98 |

**EN BANC.**

**McRAE, JUSTICE, FOR THE COURT:**

¶1. To this Court Charles Crawford appeals his conviction and sentence of death for the death of Kristy Ray in Tippah County, Mississippi in 1993. Finding no cause for reversal in any of Crawford's assignments of error, we affirm his convictions for capital murder, rape, burglary and sexual battery and their corresponding sentences, including the sentence of death by lethal injection.

### PROCEDURAL HISTORY

¶2. Charles Ray Crawford was indicted in the Circuit Court of Tippah County, Mississippi, on September 23, 1993, for the murder of Kristy D. Ray while engaged in the commission of the crime of kidnaping in violation of Miss. Code Ann. § 97-3-19(2)(e); burglary of an occupied dwelling, in violation of Miss. Code Ann. 97-17-21; rape, in violation of Miss. Code Ann. 97-3-65(2); and sexual battery, in violation of Miss. Code Ann. 97-3-95(a). The indictment also alleged that Crawford committed the above crimes as an habitual offender, as he previously had been convicted of assault and rape under Miss. Code Ann. 97-3-19(2)(e).

¶3. Venue changed from Tippah County to the Circuit Court of Lafayette County, Mississippi. A jury was seated on April 18, 1994. Crawford was found guilty of all counts on April 22, 1994. The jury

sentenced Crawford to life imprisonment for the rape. Prior to the sentencing phase of Crawford's trial with respect to the capital murder conviction, the trial judge conducted a hearing and determined Crawford to be an habitual offender as to counts I through III. The judge sentenced Crawford to serve fifteen years without parole for his burglary conviction, life imprisonment without parole for his rape conviction, and thirty years without parole for his sexual battery conviction, all to be served consecutively without the benefit of parole. Following the sentencing by the judge, the jury heard evidence and arguments in aggravation and mitigation of the sentence of death. The jury returned a sentence of death for capital murder conviction on April 23, 1994. The judge set an execution date of June 10, 1994. The execution of Crawford's death sentence has been stayed pending resolution of his appeal of the four convictions, his habitual offender status, and his death sentence. He assigns the following points of error:

**I. THE TRIAL COURT ERRED IN REFUSING TO SUPPRESS CHARLES CRAWFORD'S CONFESSION.**

**II. THE TRIAL COURT ERRED IN NOT REQUIRING THE PROSECUTION TO GIVE NOTICE OF THE AGGRAVATING CIRCUMSTANCES IN A TIMELY MANNER PRIOR TO TRIAL.**

**III. THE TRIAL COURT ERRED IN NOT ALLOWING THE DEFENSE TO VOIR DIRE THE JURY WITH REGARD TO WHETHER THEY WOULD AUTOMATICALLY VOTE FOR DEATH.**

**IV. THE TRIAL COURT ERRED IN NOT ALLOWING THE DEFENSE TO VOIR DIRE THE JURY WHETHER THEY WOULD CONSIDER MITIGATION.**

**V. IT WAS ERROR FOR THE PROSECUTOR TO VOUCH FOR THE SUFFICIENCY OF THE EVIDENCE DURING CLOSING ARGUMENT AT THE GUILTY PHASE OF THE TRIAL.**

**VI. IT WAS ERROR FOR THE PROSECUTION TO VOUCH FOR THE EVIDENCE AT THE SENTENCING PHASE OF THE TRIAL.**

**VII. THE PROSECUTOR ERRONEOUSLY ARGUED TO THE JURY THAT IT NEED NOT CONSIDER MITIGATION AND COULD DISREGARD SYMPATHY IN TOTO IN ITS DELIBERATIONS.**

**VIII. THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY THAT THE CRIME OF KIDNAPING REQUIRED THE ELEMENT OF ASPORTATION.**

**IX. THE TESTIMONY OF JULIE ANN COOPER CONCERNING THE LIKELIHOOD OF THE DNA MATCH WAS ERROR.**

**X. THE INTRODUCTION OF VICTIM IMPACT TESTIMONY VIOLATED CRAWFORD'S RIGHTS UNDER THE FEDERAL AND STATE CONSTITUTIONS.**

**XI. IT WAS ERROR FOR THE PROSECUTION TO ARGUE THAT THE JURY COULD NOT CONSIDER THE MITIGATING CIRCUMSTANCE OF "WHETHER THE**

**CAPACITY OF THE DEFENDANT TO APPRECIATE THE CRIMINALITY OF HIS CONDUCT. . . ." SINCE THE JURY HAD ALREADY DETERMINED THAT CRAWFORD WAS SANE.**

**XII. THE INSTRUCTION PURPORTING TO DEFINE "ESPECIALLY HEINOUS, ATROCIOUS OR CRUEL" WAS CONSTITUTIONALLY OVERBROAD.**

**XIII. THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT A BEYOND-A-REASONABLE-DOUBT FINDING OF "ESPECIALLY HEINOUS, ATROCIOUS OR CRUEL."**

**XIV. SENTENCING INSTRUCTION 2-A IMPERMISSIBLY LIMITED THE JURY'S CONSIDERATION OF MITIGATION.**

**XV. SENTENCING INSTRUCTION 2-A IMPERMISSIBLY SHIFTED THE BURDEN OF PROOF FROM THE PROSECUTION TO THE DEFENDANT.**

**XVI. THE USE OF AN ELEMENT OF CAPITAL MURDER AS AN AGGRAVATING CIRCUMSTANCE FAILS TO NARROW THE CLASS OF DEATH-ELIGIBLE DEFENDANTS IN A CONSTITUTIONAL MANNER.**

**XVII. THE HABITUAL OFFENDER PORTION OF THE INDICTMENT WAS INSUFFICIENT IN THAT IT FOLLOWED THE WORDS "AGAINST THE PEACE AND DIGNITY OF THE STATE" IN VIOLATION OF SECTION 169 OF THE MISSISSIPPI CONSTITUTION.**

**XVIII. THE DEATH PENALTY IS DISPROPORTIONATE IN THIS CASE GIVEN THE EXTENT OF CRAWFORD'S MENTAL HEALTH PROBLEMS.**

**XIX. THE AGGREGATE ERROR IN THIS CASE REQUIRES REVERSAL OF THE CONVICTION AND SENTENCE.**

**FACTS**

¶4. On Friday, January 29, 1993, at approximately 12:30 p.m., twenty year old Kristy Ray went to the bank where her mother worked. Kristy worked part-time at the Sunburst Bank, since she was also a student at Northeast Mississippi Community College. At about 5:15 p.m, Kristy and her mother, Mary Ray, left the bank, with plans to see each other later that night at their house in Chalybeate, a community near Walnut, Mississippi.

¶5. Mary tried to call Kristy around 6:45 p.m, but received no answer. She assumed that Kristy was visiting her boyfriend. Mary finally got to her house at about 7:00 p.m., but Kristy's car was not there. When she walked into her house, Mary found a ransom note on a table. The note, which also contained a crude map, read, "There will be a red flag somewhere on this block Tuesday, 12:00 midnight, fifteen thousand dollars in gym bag or she dies. No police." Mary noticed that Kristy had left her purse, that Kristy's room was in disarray, and that the phone was dead.

¶6. Mary left the house and drove to Walnut, first stopping at the home of Kristy's boyfriend, Brian

Mathis. Not finding her there, she next went to the video rental store where Kristy worked on the weekends; however, no one there had seen Kristy. From the video store, Mary called her husband, Tommy Ray, and then she called 911 to report Kristy's disappearance to the Tippah County Sheriff's Department. After conducting preliminary investigations, the Sheriff's Department contacted the FBI.

¶7. Mary returned home, noticing signs of forced entry. She found that a screen over a window in Kristy's room had been cut out and that a stacking pallet had been left leaning against the house under Kristy's window. Later Mary discovered that someone had been through one of the drawers in her and her husband's bedroom.

¶8. Also on the day of Kristy's disappearance, Charles Crawford's family discovered a ransom note in their attic that was similar to the one found by Mary Ray. Fearing that Crawford, who was due for trial on the following Monday for assault and rape, might kidnap someone, Crawford's mother, wife, and grandfather reported the note to William Fortier, the attorney representing Crawford on other pending criminal charges. Fortier alerted the law enforcement officials investigating the facts surrounding Kristy's disappearance. On the following day, Fortier's law clerk, Shawn Akins, met with law enforcement officials and turned over some medical records; the officials were trying to determine whether Crawford was capable of committing the crime against Kristy.

¶9. The local and federal authorities established a command post at the Chalybeate school on the Saturday following Kristy's disappearance. Additionally, authorities stationed law enforcement officers at the residence of Mr. Miles, Crawford's former father-in-law. Officers reported seeing Crawford approaching the residence, and Officers Jim Wall and Sammy Pickens of the Mississippi Highway Patrol proceeded to the place where Crawford was seen. At the scene were the sheriff of Tippah County, his deputies, and several FBI agents. When Crawford finally returned to the residence on Saturday, he was arrested, carrying a double-barrel shotgun and a switchblade.

¶10. Upon arrest, Crawford was transported by Wall and Pickens. Wall testified that in the car, he asked Crawford if he recognized him, to which Crawford replied yes. Then he advised Crawford of his *Miranda* rights. After Wall was done, Crawford asked something to the effect of "Why are you asking me this," or "What is going on here." Crawford said that he didn't know Kristy personally, but he knew her when he saw her. Wall testified that in the car, Crawford said that he thought his leg was broken, but that he did not want to go to a hospital.

¶11. Originally, Officers Wall and Pickens were directed to take Crawford to the Tippah County Jail in Ripley. They discussed taking Crawford to the hospital. While en route to the jail, they were instructed to bring Crawford back to the command center in Chalybeate. They continued with Crawford to Chalybeate.

¶12. Upon arrival at the command center, Officers Wall and Pickens turned Crawford over to Joseph Jackson, the agent in charge of FBI operations in Mississippi. Jackson re-Mirandized Crawford, and proceeded to interview Crawford with Agents Jim Maddock and Tom Bush. Crawford did not sign a waiver of his rights, but he immediately responded to Jackson after being advised of his rights, saying that he could not understand why the officers wanted to talk to him but that he would answer questions. Crawford complained that he had not been doing anything and that his back was injured as a result of falling into a well. During the interrogation, Crawford was allowed to lie prone on the floor, to alleviate any back pain he might have been suffering. Initially, Crawford said that he had

been hunting. Jackson asked Crawford if Kristy was alive and Crawford began to cry, admitting that Kristy was no longer alive. When asked, Crawford agreed to lead law enforcement to her body. Jackson testified that the questioning of Crawford took about twenty minutes.

¶13. Crawford and law enforcement officials left the command center at about 8:00 on that Saturday night. Crawford escorted law enforcement through extremely rugged terrain and thick woods. Crawford actually led the search team. Crawford never complained about his back during the search. The team reached a heavily wooded area covered with leaves, and Crawford indicated that Kristy was there. When Kristy's body was found, Crawford asked investigators why they did not finish him off. Kristy was found at approximately 9:48 p.m, approximately four hundred yards from an abandoned barn (the Hopper Barn).

¶14. Officer Wall raked the leaves back to uncover Kristy's body. He found her hands were cuffed behind her back around a small cedar sapling. A sock had been stuffed into her mouth, and a gag was around her head to keep it in place. Kristy had not been blindfolded. Her jeans had been pulled down below her hips.

¶15. Dr. Steven Hayne, a pathologist, testified that Kristy had suffered a single stab wound to her chest. Kristy had multiple abrasions over the right and left lower extremities, as well as scrapes to the skin on her back and buttocks. She also had scrapes on her face and chest, as well as contusions on her lips and abrasions on her wrist. The wrist injuries were consistent with Kristy being handcuffed. Hayne testified that the scrapes found on Kristy's buttocks and thigh occurred while Kristy was alive and were consistent with injuries a person would receive while engaged in a fight or flight response. He also testified that the injuries were consistent with Kristy being dragged along a hard surface, possibly branches or twigs. The injuries were also consistent with those occurring on someone attempting to avoid or resist a rape. The abrasions on Kristy's face and contusion on her lip were consistent with her face being pressed against a hard surface, as opposed to being dragged. Hayne testified that Kristy died from a large stab wound to the left mid-chest which punctured her heart and left lung, causing extensive internal and external hemorrhaging. It took Kristy between one and two minutes to die.

¶16. Hayne testified that the wound that caused Kristy's death could have been made by a Marine Corps-style Ka-Bar knife. The wound itself measured one and one-quarter inches in width and four and one-half inches in depth, corresponding with that knife. Kristy also suffered "multiple contusions that measured up to approximately one centimeter which would be three-eighths of an inch about the anal orifice," which suggested penetration of the anus.

¶17. On the Monday following his arrest and the location of Kristy's body, Crawford gave a more detailed account of the kidnaping and murder to the FBI. Agent Newsom Summerlin of the FBI conducted an interview of Crawford at the Union County Sheriff's Office with Lieutenant Steve Williams of the Mississippi Highway Patrol. Summerlin testified that prior to the interview, Crawford read an interrogation advice or rights form, and signed a waiver of those rights. Summerlin testified that Crawford stated that he did not know Kristy but that he had seen her around the Walnut, Mississippi area. Crawford also stated that he was worried about "an upcoming event" and wanted to be alone, and that when he wanted to be alone, he went to the Hopper Barn. Crawford stated that in the early morning of Friday, January 29, 1993, his mother, Johnny Ruth Smith, dropped him off along

Providence Road (near the Hopper Barn) to go hunting. He had an over-and-under double barrel shotgun. Crawford also stated that he had a knife similar to a Marine Corps Ka-Bar knife and a .22 caliber revolver. Crawford said that he had been stockpiling food and drink at the Hopper Barn for approximately one month, so when he got to the barn he had some cookies and a drink.

¶18. Crawford said that he was very concerned about his upcoming event, and he had considered running away, but had no money. He also considered suicide, but could not bring himself to do it. He stayed at the barn until midday, when he left to hunt and hike. After reaching an area he was not familiar with, Crawford decided to build a fire, which he soon put out because he was concerned that someone would see the smoke. It was at this point that Crawford claimed to have a blackout; he stated that the next thing he remembered was being inside the Ray residence. Crawford said that when he came out of the blackout, he heard someone crying in one of the back bedrooms of the house. Kristy was on the floor of one of the rooms with her hands cuffed behind her back. Crawford said that he put on a ski mask so that Kristy would not be able to identify him and asked Kristy where the keys to her car were. Crawford stated that he took Kristy and put her in the car and drove away. Crawford stated that he took Kristy from the house because he did not know what he was going to do and figured it was better to take her with him.

¶19. Crawford denied writing or ever having seen the ransom note found by Mary Ray. Crawford stated that Kristy was very upset when they left her house that Friday night, but as they drove around and began talking, she began to calm down. He claimed that they drove around for about forty-five minutes to an hour talking to each other. Crawford then abandoned the car and took Kristy out. She was still handcuffed, and he still had the knife, revolver, and shotgun. He claimed that he removed the handcuffs when she promised not to run away. The two of them walked back and forth along Jonesburough Road, and Crawford decided that since it was getting cold, they should go to the Hopper Barn and spend the night there.

¶20. Crawford stated that as they approached the barn, he fell into a sinkhole that came up to his neck, tossing his shotgun away as he fell. He claimed that Kristy asked him if he was all right, picked the shotgun up, and helped pull him out. Crawford claimed that he and Kristy had something to drink, ate cookies, and huddled together in the barn for warmth and talked throughout the night.

¶21. Crawford said that the next morning, Saturday, he heard a police siren and thought he saw a sheriff's office car coming away from his grandparents home, which was near the Hopper Barn. He said that he told Kristy it was the law, and she tried to talk him into turning himself in. Crawford then fled into the woods with his shotgun and knife.[1] He claimed that Kristy ran after him in order to try and convince him to turn himself in to the authorities. He claimed that Kristy told him no one had been hurt and she would help him if he turned himself in. He was concerned because he did not know how he was going to explain abducting her. Crawford said that he felt low, and Kristy had more or less convinced him to let her go.

¶22. Summerlin noted that until this time, Crawford said that he kept the ski mask on at all times except when it was dark inside the barn and Kristy could not see his face. Crawford said that when Kristy convinced him to let her go, he then took his mask off and Kristy allegedly recognized him as someone she had seen around town. Then Crawford stated that as they began walking back to Kristy's car, he gave Kristy the shotgun. Crawford claimed that at that point he had another blackout.

¶23. The next thing Crawford remembered was sitting on a stump in the woods wearing a T-shirt, blue jeans, and no shoes. Kristy was lying at his feet, handcuffed behind her back, dead. He claimed that she was fully clothed with one of his socks in her mouth. He then decided to hide the body and dragged Kristy by her feet across the ground. This is how Crawford explained her pants and underwear being pulled down and her shirt being pulled up. Then he covered her body with leaves, so that no one would find the body. Crawford stated that he sat on the tree stump for a while and thought about what he was going to do. He put his boots back on, retrieved his shotgun and knife and headed back through the woods toward the Providence Road area. Crawford said that he knew people were looking for him, but did not know why. When he neared Providence Road he saw a patrol car, so he sat on the hillside hidden from view. When the patrol car left, he crossed the road into another wooded area. Crawford claimed that he then fell into an abandoned well that was about ten feet deep and had to use his knife to dig himself out.

¶24. Crawford continued toward his residence, a house belonging to his ex-father-in-law. As he approached the house, he was arrested. After discussing with Summerlin that he realized that taking Kristy was wrong, Crawford later stated that he originally denied any knowledge of Kristy's disappearance to buy himself time to think about what he was going to do. Crawford also said that he must have killed her, but could not remember doing so. He told Summerlin that he sometimes had blackouts and could not control himself.

¶25. Stephen Thompson of the Mississippi Highway Patrol testified that clothing, bedding, handcuff keys, a padlock with keys, ammunition, food and soft drinks were found in the Hopper Barn. Tim Wilbanks testified that on February 7, 1993, volunteer searchers found a pair of shoes, men's briefs, long john bottoms, and a T-shirt near where Kristy's body was found. Wilbanks stated that the shoes, found between trees and shrubs, looked as if they had been thrown there, while the underwear and T-shirt were found under a brush pile. Joe Foster testified that he later found a knife and a pistol in a nylon holster in his field which is located approximately one-quarter mile from the Hopper Barn. Dick Koster of the Walnut Police testified that he searched the area where the knife and gun were found and discovered a belt with a Harley Davidson buckle with the name "Chuck" stamped on the back of it. This belt was similar to one worn by Crawford, whose nickname is "Chuck." Crawford had previously admitted to investigators that he owned a Marine Corps Ka-Bar knife and a Taurus .22 caliber revolver. The weapons and belt matched the descriptions Crawford gave investigators of the ones he had on the day of Kristy's disappearance.

¶26. Joe Andrews, of the Mississippi Crime Lab, testified that hairs collected from the clothing found in the Hopper Barn were compared with known samples of hair from Kristy Ray and found to exhibit the same characteristics. Andrews also testified that hairs found on clothing recovered by Wilbanks exhibited the same microscopic characteristics as pubic hairs taken from Crawford. Debbie Haller, a forensic serologist with the Mississippi Crime Lab, testified that stains found on the briefs appeared to be a mixture of blood and seminal fluid. The long johns also contained blood stains. The crime lab could not determine the blood group type from these stains. Heller forwarded samples from the briefs and long john bottoms to Cellmark Diagnostic Laboratories to conduct DNA testing, along with known blood samples from Kristy Ray. A vaginal swab taken from Kristy's body determined the presence of seminal fluid. Heller determined that Crawford could be included as a possible source of the seminal fluid.

¶27. Cellmark Laboratories conducted DNA testing of the stains found on this evidence. Julie Ann Cooper of Cellmark testified that DNA evidence extracted from the vaginal swab matched the known DNA samples of Crawford. The mix of blood and semen found on the briefs was matched to Kristy and Crawford. The bloodstain on the long johns also matched both Kristy and Crawford.

¶28. Crawford presented an insanity defense through the testimony of family members and Dr. Stanley Russel, a psychiatrist with the Mississippi Department of Corrections. Russel treated Crawford during the time he was housed at Parchman, from June of 1993. Russel testified that Crawford suffered from depression and periods of time lapse about which he has no memory. Russel diagnosed Crawford as a psychogenic amnesiac. Russel referred to the prior medical history of Crawford, including medication prescribed by a psychiatrist when Crawford was ten, his hospitalization in East Mississippi State Hospital in 1989, his hospitalization at a psychiatric facility in Memphis in 1991 and two forensic evaluations at Whitfield. Crawford had been diagnosed with bipolar disorder (manic depressive illness) in 1989, and he had been prescribed lithium, which seemed to calm the moods of manic people. Russel also testified regarding Crawford's anger and resentment as a child and his antisocial behavior as a teenager. Russel ultimately testified that in his opinion Crawford satisfied "the *M'Naghten* test for not being criminally responsible for his actions as a result of mental disorder that affected his reasoning to the point that he was not aware of the nature and consequence of his behavior."

¶29. Rebuttal testimony was presented by Dr. Chris Lott, a clinical psychologist with the Mississippi State Hospital. Lott testified that he saw no evidence that Crawford ever suffered from bipolar illness, based on his review of the diagnosis at the East Mississippi State Hospital. Lott did not think that Crawford had a disease of the mind, an illness, or major mental disorder. He testified that there was nothing in Crawford's records to show that he was delusional or that he was suffering from irrational belief or hearing voices. He also testified that Russel improperly diagnosed Crawford as a psychogenic amnesiac because Crawford "appeared to be malingering his problems or memory deficits." Lott stated that Crawford showed premeditation and that he knew the nature and the quality of his actions and that he was able to distinguish between right and wrong.

¶30. Dr. Reb McMichael, a forensic psychiatrist with the Mississippi State Hospital, testified that Crawford did not meet the requirements of *M'Naghten* at the time of the crime. McMichael stated that psychogenic amnesia was a rare diagnosis and that in his opinion, Crawford did not have it. McMichael believed that Crawford was planning an act and purposely concealed Kristy Ray's body and that this showed that he knew the nature and quality of his act--that the act was wrong and that he did not want to get caught.[(2)]

## ANALYSIS

### I. THE TRIAL COURT ERRED IN REFUSING TO SUPPRESS CHARLES CRAWFORD'S CONFESSION.

¶31. Crawford argues that his statements made to F.B.I. agents and police on Saturday, January 30, 1993, should have been suppressed because: 1) his constitutional rights were violated when he was interrogated outside the presence of his attorney; 2) his statements were involuntary in that he was in great pain and law enforcement refused to obtain medical treatment for him until they had obtained a confession; and 3) his statements were obtained with the assistance of illegally obtained and

privileged information (mental health reports obtained from Crawford's attorney without his consent). Usually for this Court, determining whether a confession is admissible is a finding of fact which is not disturbed unless the trial judge applied an incorrect legal standard, committed manifest error, or made a decision contrary to the overwhelming weight of the evidence. *Balfour v. State*, 598 So.2d 731, 742 (Miss. 1992). Crawford notes, however, and the State concedes, that the trial court did not make specific factual findings regarding the admissibility of Crawford's confession. Therefore, this Court must conduct an independent review of the totality of the circumstances discoverable in the entire record in order to resolve the questioned validity of Crawford's confession. *See Coverson v. State*, 617 So. 2d 642, 647 (Miss. 1993); *Holland v. State*, 587 So. 2d 848, 860 (Miss. 1991).

### A. The confession was taken in violation of Crawford's right to an attorney.

¶32. Crawford contends that law enforcement knew that he was represented by counsel and chose to interrogate him outside the presence of his attorney anyway. In his statement of issues, Crawford contends that admission of these confessional statements violated his Fifth and Sixth Amendment rights to counsel. However, Crawford only addresses the Sixth Amendment claim in his brief. Assignments of error unsupported by any meaningful argument or relevant authority need not be addressed on appeal. *Brown v. State*, 690 So. 2d 276, 297 (Miss. 1996). Therefore, as to the Fifth Amendment claim, Crawford is procedurally barred.

¶33. Crawford claims that the admission of his confession violated his Sixth Amendment right to counsel. Determining whether a confession is admissible is a finding of fact which is usually not disturbed by this Court unless the trial judge applied an incorrect legal standard, committed manifest error, or made a decision contrary to the overwhelming weight of the evidence. *Balfour*, 598 So. 2d at 742. However, as stated previously, the trial judge here did not make a specific finding of fact as to the admissibility of Crawford's confession. Therefore, while this Court may rely on necessarily implied findings, we are under no obligation to review under the manifest error standard.

¶34. Under the Mississippi Constitution, the Sixth Amendment "right to counsel 'attaches once the proceedings reach the accusatory stage.'" *Johnson v. State*, 631 So. 2d 185, 187-88 (Miss. 1994) (citation omitted). The right to counsel, both federal and state varieties, attaches at the point in time when the initial appearance under Rule 1.04 of the Uniform Rules ought to have been held. *Morgan v. State*, 681 So. 2d 82, 90 (Miss. 1996). As is the case with the Fifth Amendment right to counsel, a defendant's Sixth Amendment rights are not violated by questioning in the absence of his attorney unless the defendant has asserted his right to an attorney. *Wilcher v. State*, 697 So. 2d 1087, 1096 (Miss. 1997).

¶35. Though it is not particularly clear from the appellant's brief, Crawford could be making one of two arguments under the Sixth Amendment. First, Crawford may be arguing that because he was represented by Fortier in another proceeding, he was not to be questioned outside the presence of Fortier. At the time of the interrogation, Randy Fortier represented Crawford for a pending rape and assault trial, which was not connected with the disappearance of Kristy Ray. Fortier's representation did not yet extend to the offense of kidnaping. The Sixth Amendment right is offense-specific; it cannot be invoked once for all future prosecutions. *Mack v. State*, 650 So. 2d 1289, 1316 (Miss. 1994); *Balfour*, 598 So. 2d at 746. Therefore, Crawford cannot rely on the invocation of his right to counsel pursuant to previous charges of rape and assault.

¶36. It is more likely that Crawford is arguing that because he was arrested without a warrant, his proceedings had reached an accusatory stage and his Sixth Amendment right to counsel had attached. "Once the right to counsel has attached and *been asserted*, the State must of course honor it." *Morgan*, 681 So. 2d at 90 (emphasis added). Although there is debate between the parties as to when the accusatory stage began so as to jumpstart Crawford's right to counsel, we feel that this determination is not germane to the disposition of the issue. As was addressed previously, there is a conflict of testimony as to whether Crawford invoked his right to counsel. Because the trial court made a general determination of admissibility rather than a specific finding of fact, we find that the trial court did not err in admitting the confessional statement. Accordingly, Crawford's argument regarding violation of his Sixth Amendment right to counsel is without merit.

### B. The evidence shows that the confession was coerced from Crawford by denying him medical treatment.

¶37. The next sub-issue raised by Crawford is whether his confession was coerced, based on a law enforcement refusal to give him medical treatment for his back. The standard of review in such cases is the same as that applied above. "[O]nce the trial judge has determined, at a preliminary hearing, that a confession is admissible, the defendant/appellant has a heavy burden in attempting to reverse that decision on appeal." *Sills v. State*, 634 So. 2d 124, 126 (Miss. 1994)(citation omitted). "Such findings are treated as findings of fact made by a trial judge sitting without a jury as in any other context. As long as the trial judge applied the correct legal standards, his decision will not be reversed on appeal unless it is manifestly in error, or is contrary to the overwhelming weight of the evidence." *Foster v. State*, 639 So. 2d 1263, 1281 (Miss. 1994) (citations omitted). "Where, on conflicting evidence, the court makes such findings, this Court generally must affirm." *Lesley v. State*, 606 So. 2d 1084, 1091 (Miss. 1992) (citations omitted).

¶38. The general rule is that for a confession to be admissible it must have been given voluntarily, and not as the result of any promises, threats or other inducements. The burden is on the prosecution to prove beyond a reasonable doubt that the confession was voluntary. The "burden is met and a prima facie case made out by testimony of an officer, or other persons having knowledge of the facts, that the confession was voluntarily made without any threats, coercion, or offer of reward." *Chase v. State*, 645 So. 2d 829, 838 (Miss. 1994) (citation omitted).

¶39. The instant case is distinguishable from *Mincey v. Arizona*, 437 U.S. 385 (1978), cited by Crawford. In *Mincey*, there was clear, undisputed indication that the defendant wanted a lawyer. *Id.* at 399. Further, the defendant was "depressed almost to the point of coma." *Id.* at 398. Mincey had partial paralysis of one hip, wore breathing tubs, a catheter, and an IV, and was under the influence of medication. *Id.* at 396. As Crawford correctly states, evidence that the defendant was in pain during the interrogation does not, by itself, render the defendant's confession involuntary. *See Wheeler v. State*, 536 So. 2d 1347, 1349 (Miss. 1988); *Gavin v. State*, 473 So. 2d 952, 955 (Miss. 1985); *Bullock v. State*, 391 So. 2d 601, 605-06 (Miss. 1980).

¶40. Crawford testified at the suppression hearing that at the time of his arrest, he was walking with a shotgun as a crutch, because he had hurt himself. He said that he "had stepped through a dry well and fell through some tin." Crawford testified that there was some debate as to whether he should be taken to the hospital before he was taken to the Chalybeate School. He gave his interview while lying

on the floor because he "could not sit up in the chair," and told the authorities of the fact that he was in pain. Crawford testified that the authorities told him "that the quicker we got this over with the quicker we could get out of there and go on, you know, whatever attention I needed, you know, could be taken care of."

¶41. Agent Jackson testified that Crawford mentioned that he had hurt his back when he first entered the interrogation room at the Chalybeate School. Jackson asked Crawford if he would be more comfortable lying on the floor, and Crawford responded that he would. He also denied that law enforcement threatened or inferred that they would withhold medical treatment from Crawford unless he talked and answered questions. Jackson's testimony was echoed by Agents Summerlin, Williams, and Bush. Agent Maddock testified that he did not recall Crawford ever asking for medical assistance.

¶42. In the case at hand, all officers who witnessed Crawford's statement testified that it was voluntarily given. They specifically denied refusing Crawford medical treatment until he gave his statement. Therefore, the State made a prima facie showing that Crawford's statement was voluntary. Again, although the judge made no specific finding of facts regarding the admissibility of Crawford's confession, in light of the conflicting evidence, this Court will rely on the findings implied by the trial court's ruling. *Saucier v. State*, 562 So. 2d 1238, 1244 (Miss. 1990). Since it cannot be said that the trial court erred, Crawford's arguments on this point are without merit. *Hunter v. State*, 684 So.2d 625, 633 (Miss. 1996).

> **C. The confession was coerced from Crawford by law enforcement using information that was obtained in violation of Crawford's rights and is thus inadmissible as fruit of the poisonous tree.**

¶43. Crawford also asserts that F.B.I. agent Newsom Summerlin went to Randy Fortier's law office and obtained Crawford's mental health records from a law student working for Fortier. Further, prior to Crawford's arrest, F.B.I. agent Joe Jackson read the mental health records and consulted with an F.B.I. behavioral science expert about techniques for obtaining a confession from persons with Crawford's psychological profile.

¶44. Crawford now alleges that his mental health records were taken from his lawyer without Crawford's consent, thereby making them illegally obtained. Crawford argues further that the use of illegally obtained material to extract a confession from him renders his confession illegal as well. The State argues that the records were not confidential and that the evaluations of Crawford were done in anticipation of his rape and assault trial, thus meaning that discovery of the records was inevitable.

¶45. Crawford claims that his mental health records were subject to the attorney/client privilege under the Mississippi Rules of Evidence, Rule 502(b). That rule reads as follows:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (1) between himself or his representative and his lawyer or his lawyer's representative, (2) between his lawyer and the lawyer's representative, (3) by him or his representative or his lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another party in a pending action and concerning a matter of common

interest therein, (4) between representatives of the client or between the client and a representative of the client, or (5) among lawyers and their representatives representing the same client.

Miss. R. Evid. 502(b). Confidential communications are those "not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication." Miss. R. Evid. 502(a)(5).

¶46. Crawford's mental health records are not a part of the record on appeal. A party seeking reversal of the judgment of a trial court must present this Court with an adequate record to show that reversible error has been committed. *Chase*, 645 So. 2d at 845; *Hansen v. State*, 592 So. 2d 114, 127 (Miss. 1991); *Smith v. State*, 572 So. 2d 847, 849 (Miss. 1990). This Court has stated, "[W]e know of no authority for pretermitting the requirement of a record reflecting the error." *Queen v. Queen*, 551 So. 2d 197, 199 (Miss. 1989). If the mental health records released by Crawford's attorney contained disclosures made to a mental health professional in preparation of Crawford's defense, then the records may be privileged. However, if Fortier released records that only showed Crawford's prior confinement to a state hospital, the records may not be privileged. Either way, this Court would need the actual mental health records to determine whether the attorney-client privilege protected them from disclosure. Presently, the Court has no basis on which to conclude that Crawford's records were confidential.

¶47. Even if the records were privileged, however, Crawford's rights were not violated when his attorney turned the records over to law enforcement. Although Fortier did not testify at the pretrial hearing, he did testify at the trial.

> Q: Okay. And what if anything happened that caused you to relinquish or to well to relinquish that representation?
>
> Fortier: The case, the cases that I had been retained to represent Mr. Crawford on concerned some criminal cases in the circuit court of Tippah County. These cases were set for trial on Tuesday, on Friday I believe or the week before these cases were to go to trial I received a phone call early Friday morning from Mr. Crawford's mother telling me that something urgent had come up; that she needed to talk to me. At that point in time I made arrangements for her to come to the office and meet with me. She came to the office with I believe it was Mr. Crawford's wife Gail and also with Mr. Crawford's grandfather Mr. John Lee Montgomery and at that time they told me certain things and information that related to this case that is being tried today. From that point it put me in a very difficult situation from the standpoint that I was representing Mr. Crawford and of course there was an attorney client privilege and I had to represent his rights but at this point in time it with the possibility with the possibility of another crime being committed I had a duty to tell them what knowledge I had about this and because of the conflicts of interest that was created arising out of this situation I didn't have any choice to but to withdraw as Mr. Crawford's attorney in the previous cases.

According to this testimony, Fortier, in good faith, believed that Crawford may have been committing a crime. Although Fortier did not personally turn over any of Crawford's medical records to the police, the relationship between Fortier and Crawford extended to Fortier's law clerk, Shawn Akins.

[Miss. R. Evid. 502(a)(4)](). *See also* [Miss. Rules of Professional Conduct, Rule 5.3 (c)](). Akins actually turned over Crawford's records. Fortier testified that he remembered telling Akins that the attorney client privilege existed but a serious crime had been committed. Pursuant to Rule 1.6 of the Mississippi Rules of Professional Conduct, neither Fortier nor Akins can be faulted for providing Crawford's mental health records to law enforcement officials. Assuming that the records were privileged and confidential, Rule 1.6(b)(1) states that a lawyer may reveal such confidential information to the extent the lawyer reasonably believes necessary "to prevent the client from committing a criminal act." Therefore, since the records were not obtained illegally, Crawford's confession (which may or may not have resulted from use of the mental records) was not illegal on this basis. This assignment of error is without merit.

### D. Conclusion

¶48. The confession taken from Crawford by law enforcement officials was not coerced and did not violate his constitutional rights or the attorney-client privilege. Therefore, the confession was admissible. The trial court did not err in denying Crawford's motion to suppress, and assignment of error I is without merit.

## II. THE TRIAL COURT ERRED IN NOT REQUIRING THE PROSECUTION TO GIVE NOTICE OF THE AGGRAVATING CIRCUMSTANCES IN A TIMELY MANNER PRIOR TO TRIAL.

¶49. Three months before his trial began, Crawford filed a motion requesting that the prosecution give timely notice of the aggravating circumstances it was seeking in support of the death penalty. The trial court ordered that such notice would be given with the filing of the jury instruction twenty-four hours prior to trial. Crawford now alleges that this notice was insufficient and that the failure to require adequate disclosure of aggravating circumstances was error.

¶50. This Court has stated:

> [w]e believe that the fact that our capital murder statute lists and defines to some degree the possible aggravating circumstances surely refutes the appellant's contention that he had inadequate notice. Anytime an individual is charged with murder, he is put on notice that the death penalty may result. And, our death penalty statute clearly states the only aggravating circumstances which may be relied upon by the prosecution in seeking the ultimate punishment.

*Williams v. State*, 445 So. 2d 798, 804-05 (Miss. 1984). This Court found that defendant Williams received adequate notice. *Id.* at 805.

¶51. Upon indictment, Crawford knew that the State was charging him with capital murder predicated on the underlying felony of kidnaping. Further, he was aware that the State would be seeking the death penalty. The docket entry sheet reflects that the State filed its jury instructions on February 9, 1994, one week after the preliminary hearing in which Crawford complained that he had not received notice, and over two months before trial. Therefore, despite the trial court's instruction that the State be required to give notice twenty-four hours prior to trial, here Crawford had sufficient notice of the aggravating circumstances sought by the State. Pursuant to *Williams v. State*, *supra*, then, Crawford received adequate notice of the aggravating circumstances. Accordingly, this

assignment of error is without merit.

**III. THE TRIAL COURT ERRED IN NOT ALLOWING THE DEFENSE TO VOIR DIRE THE JURY WITH REGARD TO WHETHER THEY WOULD AUTOMATICALLY VOTE FOR DEATH.**

**IV. THE TRIAL COURT ERRED IN NOT ALLOWING THE DEFENSE TO VOIR DIRE THE JURY WHETHER THEY WOULD CONSIDER MITIGATION.**

¶52. Crawford alleges that he was not allowed to fully voir dire the jury as to whether they would automatically vote to impose the death penalty or whether they would consider mitigating evidence.

¶53. Voir dire is conducted under the supervision of the trial court, and a great deal must, of necessity, be left to its sound discretion. *Ballenger v. State*, 667 So. 2d 1242, 1250-51 (Miss. 1995). This Court has directed that, notwithstanding a prospective juror's scruples, the trial court "should inquire further whether the juror would follow its instructions and a fair verdict render according to the law and the evidence." *Hansen*, 592 So. 2d at 128. This Court similarly has directed the trial court to take a substantial role in conducting *Witherspoon* voir dire of potential jurors in capital cases. *See Hansen*, 592 So. 2d at 128-29; *Lockett v. State*, 517 So. 2d 1317, 1335 (Miss.1987); *Gray v. State*, 472 So. 2d 409, 421 (Miss.1985), *rev'd on other grounds*, 481 U.S. 648 (1987).

¶54. The issue argued by Crawford about whether the prospective jurors would automatically vote to impose the death penalty is the reverse of that propounded in *Witherspoon v. Illinois*, 391 U.S. 510 (1968), and its progeny, where it was held that a juror who would never vote for the death penalty regardless of circumstances or what instructions of law were given is not impartial and should be removed for cause. The United States Supreme Court in *Morgan v. Illinois*, 504 U.S. 719 (1992), held that the trial court erred in refusing to ask whether a potential juror would automatically impose the death penalty upon finding the defendant guilty. It is logical that the Circuit Court should take a similar role when conducting reverse *Witherspoon* voir dire.

¶55. Regarding *Witherspoon* voir dire, Crawford points to one instance in which his attorney attempted to question the potential jurors about whether they would automatically vote for the death penalty.

> Pannell: Is there anyone else that believes that a person who is found guilty of capital murder that is a murder committed in the commission of another crime, which in this case is alleged to be kidnaping should automatically get the death penalty if they are found guilty other than the people that responded none of you think that that ought to be automatic. Let me add in are there any of you that feel that the death penalty ought to be automatic and the situation where someone kills another after committing or during committing a sexual assault; would that change if we add that to the equation; does anyone think that that should bring an automatic death penalty?
>
> Little: Object to the form of the question, Your Honor, process of aggravation in mitigation not just the way its. [sic]
>
> The Court: Rephrase your question. I think your [sic] in the right area rephrase your question.

Pannell: Is there anybody here, well let me preface this; you have been told that if there is a penalty phase in this trial that Mr. Crawford is found guilty that you will be asked to impose the death penalty. That your alternative to that will in this case be life without the possibility of parole. And that the State will argue and perhaps put on evidence as to certain aggravating factors and in other words things that tend to show that the crime was worse that would tend to show that the Defendant deserved more punishment and that the Defendant would be allowed to put on proof in mitigation in other words evidence that even though he were guilty of the act charged that there were other things that acted to or that would act to show or give you an opportunity to consider mercy in this case.

Little: Object to that, Your Honor.

Pannell: Is there any one here--

Little: Excuse me, I object to the mercy part. Know where he is trying to go but that is not the right way to do it.

The Court: Objection sustained. Rephrase your question.

Pannell: Is there anyone here that because they had sat on a jury and decided that Mr. Crawford was guilty of the crime of all of the crimes charged that would not listen to this mitigating evidence that would not apply it. Now I know that two of you have said that you just couldn't do that. That if he was found guilty that you would automatically vote for the death penalty and it didn't matter what the mitigation showed. Is there anybody here that could not look at the mitigation and give it weight in terms of the sentencing phase of this trial. And if I had asked the question in a different way would your answers could it have to be depends on what it is. Is there any of you who would refuse to consider a mitigating factor that Mr. Crawford's family did in fact care about him and love him? Is there any of you that would refuse to consider a mitigating factor if shown to you that Mr. Crawford had made some type of satisfactory adjustment to life in prison? Is there any of you that would refuse to consider.

Little: Your Honor, if I could. I don't know if it's proper for voir dire to go down the possible list of the mitigation circumstances. I know we could not ask them on our voir dire.

The Court: I think you covered by asking if they would consider mitigating circumstances. I think you have very capably done that. I think you are correct it would be form of the proof the instructions but I think you have asked whatever.

Even though Crawford alleges that the trial judge's rulings amounted to a refusal to allow the defense to adequately question the venire during voir dire, the trial judge did not err. The trial judge himself conducted voir dire regarding whether the venire would automatically vote to impose the death penalty or automatically vote not to impose the death penalty. Therefore, under *Ballenger*, the trial judge conducted sufficient questioning, and combined with the individual examination of jurors, voir dire of the venire was sufficient as to whether anyone would automatically vote to impose death. The trial judge also conducted voir dire in relation to evidence of mitigation while inquiring in regards to automatic imposition of the death penalty. The trial judge told defense attorney Pannell that he had already asked if they would consider mitigating circumstances, which Pannell had done. The

defendant is entitled to ask whether the potential jurors would consider mitigating circumstances, and here the defense attorney was not precluded from doing so.[(3)] Assignments of error III and IV are without merit.

## V. IT WAS ERROR FOR THE PROSECUTOR TO VOUCH FOR THE SUFFICIENCY OF THE EVIDENCE DURING CLOSING ARGUMENT AT THE GUILTY PHASE OF THE TRIAL.

¶56. Crawford contends that during the closing argument in the guilt phase of his trial, District Attorney Little asked the jury to vote guilty based on the fact that this was a case, unlike others the district attorney had tried, where there was plenty of evidence. Therefore, Crawford insists that the argument constituted improper vouching for the sufficiency of the evidence. No contemporaneous objection to the prosecutor's statement was raised by the defense counsel. Therefore, the error is procedurally barred. "Counsel may not sit idly by making no protest as objectionable evidence is admitted, and then raise the issue for the first time on appeal." *Davis v. State*, 684 So. 2d 643, 658 (Miss. 1996).

## VI. IT WAS ERROR FOR THE PROSECUTION TO VOUCH FOR THE EVIDENCE AT THE SENTENCING PHASE OF THE TRIAL.

¶57. Crawford alleges that the prosecutor improperly vouched for evidence in the sentencing phase of his trial. Crawford contends that during closing argument in the sentencing phase, the district attorney impermissibly characterized himself as an unpaid volunteer for the people of the State and described why he thought the death penalty was proper in this case. Crawford believes that the prosecutor's argument told the jury that "it should base a finding of especially heinous, atrocious, or cruel, on the prosecutor's assurances that this was one of the most deserving of that appellation out of the eight hundred cases a year that are processed through the District Attorney's office." Once again, however, defense counsel failed to make a contemporaneous objection to the prosecution's arguments. Therefore, the issue is procedurally barred. *Davis*, 684 So. 2d at 663.

## VII. THE PROSECUTOR ERRONEOUSLY ARGUED TO THE JURY THAT IT NEED NOT CONSIDER MITIGATION AND COULD DISREGARD SYMPATHY IN TOTO IN ITS DELIBERATIONS.

¶58. Crawford alleges that during closing argument of the sentencing phase, the district attorney told the jury that it should not consider sympathy for the defendant's family in determining the appropriate sentence. Again, for failure to contemporaneously object, this assignment of error is procedurally barred. In *Hansen v. State* this Court held, "We find in the record no defense objection to either of these arguments. Given the wide latitude generally available counsel in closing argument, we hold Hansen's failure to object leaves the points waived and requiring no further consideration." *Hansen*, 592 So.2d at 139-40. (citations omitted). Likewise, in *Foster*, 639 So. 2d at 1289, this Court held that the defendant was procedurally barred from challenging remarks made by the prosecution during closing argument when the record demonstrated that the defendant did not lodge a contemporaneous objection at trial. *See also Davis v. State*, 660 So. 2d 1228, 1245-46 (Miss. 1995). Accordingly, this assignment of error is procedurally barred.

## VIII. THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY THAT THE

**CRIME OF KIDNAPING REQUIRED THE ELEMENT OF ASPORTATION.**

¶59. Crawford argues that Instruction S-6 was erroneous in that it instructed the jury on the underlying felony of kidnaping as it applied to the capital murder charge, but failed to contain the necessary element of asportation. Crawford's claim is procedurally barred. *Davis*, 684 So. 2d at 663. Not only did Crawford's counsel not object to the instruction given, he also stated, "That is a fair statement of the law." This assignment of error has no merit.

## IX. THE TESTIMONY OF JULIE ANN COOPER CONCERNING THE LIKELIHOOD OF THE DNA MATCH WAS ERROR.[(4)]

¶60. Crawford argues that the trial judge erred in permitting the jury to hear expert testimony regarding the likelihood of a DNA match as calculated by the product rule method on the grounds that a product rule calculation was not applicable. The defendant does not now question the general admissibility of DNA evidence. Therefore, Crawford argues that the depositing of the samples of Kristy's blood and Crawford's semen were not independent events and the odds of Kristy's DNA matching blood on the briefs and the odds of Crawford's semen matching semen on the briefs should not have been subject to the product rule. The State responds that Crawford's current argument is procedurally barred because it was not the basis of Crawford's objection to Forman's testimony at trial. Alternatively, the State argues that Forman's testimony was wholly proper.

¶61. Crawford relies solely on *People v. Collins*, 438 P.2d 33 (Cal. 1968), for the proposition that the application of the product rule to this case was erroneous, since "the occurrence of Kristy Ray's DNA on an item and the occurrence of the perpetrator's DNA being on an item are not traits independent of each other." In his motion in limine to prevent introduction of DNA evidence, Crawford criticized the use of the product rule and the statistics used to explain the meaning of a "match" produced by Restriction Fragment Length Polymorphism (RFLP) testing. Indeed, two population geneticists, among others, have asserted that the product rule is flawed because it rests on the assumption that major population groups, such as Caucasians and Blacks, mate randomly across groups. They contended that, in fact, members of subgroups tend to mate within their own subgroup, resulting in population substructuring, which, in turn, alters the gene frequencies and renders estimates obtained through the product rule invalid. R.C. Lewontin and Daniel L. Hartl, "Population Genetics in Forensic DNA Typing", *Science*, vol. 254, Dec. 20, 1991, at 1745-50.[(5)]

¶62. As part of its presentation of DNA evidence, the prosecution called Lisa Forman, a population geneticist, to testify about the likelihood of Crawford's DNA matching the DNA found on the clothing of the victim.

> Forman: A status tissue or population geneticist would say the likelihood that a random person who was not those two people but a random person would match would be approximately one in five hundred thousand per set of samples. So each situation is unique. The fact that Kristy Ray matches this set of samples over here that is one in five hundred thousand of and by itself. And the fact that Charles Crawford matches this set of samples over here, that's one in five hundred thousand of and by itself using the modified ceiling method. The fact that they both match a set of crime scene samples in which both people were for whatever other reasons appear to have been involved is now something that you might wish to consider statistically together.

Robinson: Is there an accepted method of doing that, combining the items and comparing those numbers together?

Forman: Well if they are truly independent you could multiply by five hundred thousand by five hundred thousand and come up with some extraordinary number but you would have to determine whether or not they were both truly independent events first.

When asked whether the odds of Kristy Ray's and Crawford's DNA matching off the same exhibit would be greater than one in five hundred thousand if the long johns and briefs were added together, Forman responded, "If again those are independent events you would be multiplying those frequencies and the more you multiply small numbers together the smaller those numbers become and the more rare an event is likely to happen by chance alone."

¶63. It is well settled that the determination of the admissibility of expert witness testimony rests within the sound discretion of the trial judge. In *Polk v. State*, 612 So.2d 381, 393 (Miss.1992), this Court held that evidence of a DNA match using RFLP analysis was admissible. In *Polk*, the trial court refused to admit population statistics, and this Court did not discuss on appeal the admissibility of those statistics because of that ruling. *Id.* at 390. However, this Court did mention that an expert's testimony as to those statistics went to the credibility of the testimony. *Id.* at 393.

¶64. Recently, this Court had another opportunity to pass upon the propriety of DNA evidence. In *Hull v. State*, 687 So.2d 708, 727 (Miss. 1996), the defendant argued that evidence of a DNA match should not have been admitted unless reasonable probability estimates were also admitted. This Court held "that where the trial court finds that evidence of a DNA match is admissible as relevant, the court should also allow scientific statistical evidence which shows the frequency with which the match might occur in the given population." *Id.* at 728.

¶65. In the instant case, the trial court denied Crawford's motion in limine regarding presentation of DNA evidence. This constituted a finding that the DNA testimony from Forman was admissible as relevant, pursuant to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)[6]. As such, it was proper for Forman to give statistics to show the frequency with which a match might occur in the general population. Further, contrary to Crawford's allegation, the jury was not instructed to apply the product rule to the DNA match statistics. As Forman's testimony shows, before the product rule could be applied, a determination would have to be made that the events (the occurrence of Ray's DNA and Crawford's DNA together on two different items) were independent of each other. No evidence was elicited to show that such a determination had been made, so the jury could not have made such a leap. More importantly, Forman testified regarding the "modified ceiling" method of working through the population genetics models, as recommended by the National Research Council, unlike the professor of mathematics in *People v. Collins*, who showed no evidence to sustain his individual probability factors. This Court has concluded that the DNA methodology employed by population geneticists, if conducted properly, satisfies the *Frye* standard. The trial court here considered the DNA analysis in light of *Frye* and found the evidence of DNA matching admissible. In light of that finding, it cannot be said that the trial court manifestly erred.

## X. THE INTRODUCTION OF VICTIM IMPACT TESTIMONY VIOLATED CRAWFORD'S RIGHTS UNDER THE FEDERAL AND STATE CONSTITUTIONS.

¶66. Crawford's tenth assignment of error alleges that the trial court improperly allowed victim impact testimony in violation of the Eighth and Fourteenth Amendments and the Mississippi Constitution. During the sentencing phase of the trial, the prosecution called Mary Ray, the mother of Kristy Ray, to the stand to talk about the impact of Kristy's death on her and her husband.

¶67. "Victim impact statements are those which describe the victim's personal characteristics, the emotional effect of the crimes on the victim's family, and the family's opinions of the crimes and the defendant." *Wells v. State*, 698 So. 2d 497, 512 (Miss. 1997). This Court adopted the opinion of the United States Supreme Court in *Payne v. Tennessee*, 501 U.S. 808 (1991), that the Eighth Amendment does not bar victim impact evidence and prosecutorial argument during the penalty phase of a capital trial. *Conner v. State*, 632 So. 2d 1239, 1276-77 (Miss.1993), *cert. denied*, 513 U.S. 927 (1994); *Jenkins v. State*, 607 So. 2d 1171, 1183 (Miss.1992); *Hansen*, 592 So. 2d at 146-47. "A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Jenkins*, 607 So. 2d at 1183.

¶68. This Court has determined that victim impact evidence, if relevant, is admissible in the sentencing stage. *Davis*, 684 So. 2d at 661. This Court has also held that evidence about the characteristics of the victim is relevant to the crime charged. "The evidence offered was proper and necessary to a development of the case and true characteristics of the victim and could not serve in any way to incite the jury." *Jenkins*, 607 So. 2d at 1183 (finding that evidence that victim was a mother, that she was a wife of four years, and that she was shy and did not like to wear dresses because they exposed her legs was relevant). Therefore, the evidence about the impact of Kristy Ray's death on her family was properly admitted. *Wilcher*, 697 So. 2d at 1104.

## XI. IT WAS ERROR FOR THE PROSECUTION TO ARGUE THAT THE JURY COULD NOT CONSIDER THE MITIGATING CIRCUMSTANCE OF "WHETHER THE CAPACITY OF THE DEFENDANT TO APPRECIATE THE CRIMINALITY OF HIS CONDUCT. . . ." SINCE THE JURY HAD ALREADY DETERMINED THAT CRAWFORD WAS SANE.

¶69. Crawford contends that during closing argument of the sentencing phase, the prosecutor told the jury that it could not consider the mitigating circumstance of whether the capacity of the defendant to appreciate the criminality of his conduct and conform his conduct to the law was impaired. No contemporaneous objection was made to the alleged suggestion by the prosecutor, so the issue is procedurally barred. *Davis*, 684 So. 2d at 663.

## XII. THE INSTRUCTION PURPORTING TO DEFINE "ESPECIALLY HEINOUS, ATROCIOUS OR CRUEL" WAS CONSTITUTIONALLY OVERBROAD.

¶70. Crawford complains that the instruction given by the trial court on the "heinous, atrocious or cruel" (HAC) aggravating circumstance was unconstitutionally overbroad. The instruction complained of, Sentencing Instruction 2-A, read as follows:

> The court instructs the jury that considering whether the capital offense was especially heinous atrocious, or cruel, heinous means outrageously wicked and shockingly; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with

indifference to or even enjoyment of the suffering of others.

An especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of murders--the conscienceless or pitiless crime which is unnecessarily torturous to the victim.

If you find from the evidence beyond a reasonable doubt that the defendant utilized a method of killing which caused serious mutilation, or that there was dismemberment of the body prior to death, or that the defendant inflicted physical or mental pain before death, or that there was mental torture or aggravation before death, or that a lingering or torturous death was suffered by the victim then you may find this aggravating circumstance.

¶71. This Court has repeatedly held that this exact narrowing instruction on the "heinous, atrocious and cruel" aggravator satisfies constitutional requirements. *Lester*, 692 So. 2d at 797-98 (Miss. 1997); *Jackson v. State*, 684 So. 2d 1213, 1236-37 (Miss. 1996); *Carr v. State*, 655 So. 2d 824, 851-52 (Miss. 1995); *Conner*, 632 So. 2d at 1269-71; *Jenkins*, 607 So. 2d at 1181-82. This Court will not reverse Crawford's conviction and sentence on an argument consistently found to be ineffective.

## XIII. THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT A BEYOND-A-REASONABLE-DOUBT FINDING OF "ESPECIALLY HEINOUS, ATROCIOUS OR CRUEL."

¶72. Crawford argues that the "especially heinous, atrocious, or cruel" circumstance was not shown beyond a reasonable doubt. Further, he states that the only justification for the aggravator was the "blamelessness" of the victim. However, this Court has held that even if an "especially heainous atrocious, or cruel" aggravating circumstance is erroneously submitted to a sentencing jury, a death sentence does not necessarily have to be set aside, as long the jury determined that one or more other valid aggravating circumstances existed. *Johnson v. State*, 547 So. 2d 59, 60 (Miss. 1989).

¶73. Appellate courts assume that juries follow the instructions. *Payne v. State*, 462 So. 2d 902, 904 (Miss.1984). In the present case, the jury found that the aggravating circumstances outweighed the mitigating circumstances presented by Crawford. We have previously refused to re-weigh aggravating and mitigating circumstances on appeal. *See, e.g.*, *Clemons v. State*, 593, So. 2d 1004, 1006 (Miss. 1992). In the instant case, we find no reason to question the jury's finding as to the aggravating and mitigating factors.

¶74. As stated in the discussion of the previous assignment of error, the "heinous, atrocious, or cruel" instruction was properly limited. In addition, we find that there was sufficient evidence in the record to warrant the instruction. Although Dr. Steven Hayne did testify that Kristy Ray died within a minute or two after being stabbed, there are other facts supporting the instruction. The evidence indicated Crawford sexually penetrated Kristy anally. He stuffed a sock in her mouth and stabbed Kristy Ray once with a blade seven inches long, with such force that the knife caused a wound four and a half inches deep, piercing her heart and lung. Crawford left Kristy to bleed to death, handcuffed to a tree and alone in the woods. Crawford, after a period of reflection, buried Kristy under a pile of leaves and left the scene. For these reasons, Crawford's contention regarding the impropriety of the "especially heinous, atrocious, or cruel" aggravator is without merit.

## XIV. SENTENCING INSTRUCTION 2-A IMPERMISSIBLY LIMITED THE JURY'S CONSIDERATION OF MITIGATION.

¶75. Crawford argues that the jury was reasonably likely to interpret its instructions as a requirement that it make a finding as a unanimous jury, not as individual jurors, before considering a mitigating factor in any way in the sentencing process. He contends that the language of Instruction 2-A could have misled the jury to believe that a finding of mitigating circumstances must be unanimous. The United States Supreme Court in McKoy v. North Carolina, 494 U.S. 433 (1990), found that a jury instruction which requires the jury to unanimously find mitigating circumstances in the balancing process "impermissibly limits jurors' consideration of mitigating evidence" and violates the Eighth Amendment. *Id.* at 444.

¶76. This specific question has been resolved by this Court on several occasions, most recently in *Davis v. State*:

> Davis complains that the jury was never instructed that mitigating circumstances were to be found individually and not unanimously prior to being considered in the weighing process. In summary, Davis argues that because findings of aggravating circumstances had to be unanimous, reasonable jurors may have reached a like conclusion concerning the finding of mitigating circumstances. Davis relies upon ***McKoy v. North Carolina***, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990); ***Mills v. Maryland***, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988); and *State v. McNeil*, 327 N.C. 388, 395 S.E.2d 106 (1990), cert. denied, *North Carolina v. McNeil*, 499 U.S. 942, 111 S.Ct. 1403, 113 L.Ed.2d 459 (1991)(holding that oral instructions which require a jury to find mitigating circumstances unanimously to be reversible error).
>
> Other courts have extended the holdings of *McKoy* and *Mills* to reverse death sentences where the jury was not told explicitly that mitigating circumstances are to be found and weighed by individual jurors. However, this Court in *Hansen v. State*, 592 So.2d 114, 149-50 (Miss.1991), declined to extend these holdings. Where the instruction does not use the words "unanimously" nor "unanimous" in the mitigating circumstances portion of the jury instructions "but instead is found only in the aggravating circumstances portion," we have held that the instruction does not offend the holding in *Mills*. *Id.* This Court has previously rejected this argument. *See, e.g., Ladner v. State*, 584 So.2d 743, 760 (Miss.1991); *Willie v. State*, 585 So.2d 660, 681 (Miss.1991); *Turner v. State*, 573 So.2d 657, 668 (Miss.1990); and *Shell v. State*, 554 So.2d 887 (Miss.1989), reversing on other grounds, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990).

*Davis*, 684 So. 2d at 664-65. Because Crawford's argument parallels that considered and rejected by this Court in *Davis*, we will treat Crawford's argument similarly. Accordingly, this assignment of error is without merit.

## XV. SENTENCING INSTRUCTION 2-A IMPERMISSIBLY SHIFTED THE BURDEN OF PROOF FROM THE PROSECUTION TO THE DEFENDANT.

¶77. Crawford argues that Instruction 2-A, informing the jury that the defendant had the burden of proving that the mitigating circumstances outweighed the aggravating circumstances, impermissibly

shifts the burden of proof from the prosecution to the defendant. This claim is meritless. Instruction 2-A correctly stated the law, as it is clearly pronounced in Miss. Code Ann. § 99-19-101 (1994), that the mitigating circumstances must outweigh the aggravating circumstances:

> (2) After hearing all the evidence, the jury shall deliberate on the following matters:
>
> (a) Whether sufficient factors exist as enumerated in subsection (7) of this section;
>
> (b) Whether sufficient aggravating circumstances exist as enumerated in subsection (5) of this section;
>
> (c) *Whether sufficient mitigating circumstances exist as enumerated in subsection (6) of this section, which outweigh the aggravating circumstances found to exist*; and
>
> (d) Based on these considerations, whether the defendant should be sentenced to life imprisonment, life imprisonment without eligibility for parole, or death.
>
> (3) For the jury to impose a sentence of death, it must unanimously find in writing the following:
>
> (a) That sufficient factors exist as enumerated in subsection (7) of this section;
>
> (b) That sufficient aggravating circumstances exist as enumerated in subsection (5) of this section; and
>
> (c) *That there are insufficient mitigating circumstances, as enumerated in subsection (6), to outweigh the aggravating circumstances*.

Miss. Code Ann. § 99-19-101(2) & (3) (1994)(emphasis added). This Court has stated, "Miss. Code Ann. § 99-19-101(2)(c) clearly requires that the jury find that the mitigating circumstances outweigh the aggravating circumstances." *Foster*, 639 So. 2d at 1301. This Court has previously rejected the argument that the burden of proof is shifted by requiring that the mitigating circumstances outweigh the aggravating circumstances. *Lester*, 692 So.2d at 769. Crawford's argument is meritless.

## XVI. THE USE OF AN ELEMENT OF CAPITAL MURDER AS AN AGGRAVATING CIRCUMSTANCE FAILS TO NARROW THE CLASS OF DEATH-ELIGIBLE DEFENDANTS IN A CONSTITUTIONAL MANNER.

¶78. Crawford was indicted for capital murder, under Miss. Code Ann. § 97-3-19(2)(e), murder in the course of kidnaping. Crawford's jury was instructed to consider three aggravating circumstances in deciding upon death as a sentence: 1) the defendant was previously convicted for a felony involving the use or threat of violence; 2) the offense was committed during the crime of kidnaping; and 3) the offense was especially heinous, atrocious or cruel. Crawford now alleges that the use of kidnaping as both an element of capital murder and as an aggravating circumstance violates the Eighth Amendment. Specifically, he contends that Mississippi's capital sentencing scheme fails the requirement of a means by which to narrow those convicted of the death eligible crimes to the few individuals most deserving to be executed.

¶79. This Court addressed a similar question in *Blue v. State*, 674 So. 2d 1184 (Miss. 1996). Blue

contended that the "sexual battery" aggravating circumstance used in the instruction was neither "determinate" nor "genuinely narrow" as required under *Arave v. Creech*, 507 U.S. 463 (1993). In *Creech*, the United States Supreme Court stated:

> Our precedents make clear that a State's capital sentencing scheme also must "genuinely narrow the class of persons eligible for the death penalty." When the purpose of a statutory aggravating circumstance is to enable the sentencer to distinguish those who deserve capital punishment from those who do not, the circumstance must provide a principled basis for doing so. If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm.

*Id.* at 474 (citations omitted and emphasis added). In rejecting Blue's argument, this Court held that because the defendant had committed two separate acts of sexual battery, the latter act of sexual battery aggravated the crime and narrowed the class substantially. *Blue*, 674 So. 2d at 1217.

¶80. This Court reviewed another similar claim in *Foster v. State*, 687 So. 2d 1124, 1139 (Miss. 1996). Foster argued that because the jury found that he committed capital murder in the commission of the crime of robbery, the aggravating circumstance which alleged that the crime was committed during the course of robbery duplicated an element of the offense of capital murder. *Id.* As a result, Foster argued, the double counting was constitutionally infirm because it did not narrow the class of death-eligible defendants in a rational manner. *Id.* In deciding *Foster*, this Court relied on its resolution of this exact question in *Leatherwood v. State*, 435 So.2d 645 (Miss.1983).

> He [being the defendant Leatherwood] reasons that since robbery is an element of capital murder, that it should not also be used as an aggravating circumstance as permitted under Mississippi Code Annotated section 97-3-19 (Supp.1982). The appellant suggests that this causes him to begin the sentencing stage with one aggravating circumstance against him and thus starts at a disadvantage rather than with a clean slate. He argues that the weighing process is already stacked against him before he even gets up to offer anything in mitigation; and that his practice brings us precariously close to the old ways of mandatory, arbitrary statutes condemned in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

> We do not agree with the appellant's contention. Under our capital murder statute, when an accused is found guilty of capital murder arising out of a robbery, he then becomes subject to a jury finding that he should be executed if the jury feels that the facts justify it. However, his execution is not mandated and the jury may properly find that he should be sentenced to life in prison. They may so find whether the defendant puts on any evidence of mitigating circumstances or not. This is a far cry from the old statute which mandated execution upon conviction of a capital offense.

*Leatherwood*, 435 So.2d at 650. This Court has already resolved Crawford's contention, previously upholding the use of an underlying offense as an aggravating circumstance in keeping with the United States Supreme Court's ruling in *Lowenfield v. Phelps*, 484 U.S. 231 (1988). *Foster*, 687 So. 2d at 1139. Therefore, Crawford's assignment of error is without merit.

## XVII. THE HABITUAL OFFENDER PORTION OF THE INDICTMENT WAS INSUFFICIENT IN THAT IT FOLLOWED THE WORDS "AGAINST THE PEACE AND

**DIGNITY OF THE STATE" IN VIOLATION OF SECTION 169 OF THE MISSISSIPPI CONSTITUTION.**

¶81. Crawford argues that the portion of the indictment charging him with habitual offender status was contained on a page attached to the rest of the indictment, coming after the signature of the grand jury foreman and after the phrase "against the peace and dignity of the State of Mississippi." His position is that the habitual offender portion of the indictment is fatally defective. Crawford relies on the case of *McNeal v. State*, 658 So.2d 1345 (Miss. 1995) to seek vacation of his habitual offender status.

¶82. The State argues that the procedure of referring within each count to the fact that Crawford was being indicted as a habitual offender satisfied the technical statutory requirements for the indictment. The State also argues that Crawford is procedurally barred from making a claim of a defective indictment, because he failed to demur or bring the defect to the attention of the trial judge. *Brandau v. State*, 662 So. 2d 1051, 1053 (Miss. 1995). The issue of a faulty indictment was first mentioned on appeal to this Court. The deficiency appearing in the indictment complained about by Crawford is non-jurisdictional, and may not be raised for the very first time on direct appeal absent ". . . a showing of cause and actual prejudice." *Brooks v. State*, 573 So. 2d 1350, 1353 (Miss. 1990). *See* Miss. Code Ann. § 99-39-21(1) (1994).

¶83. This Court particularly noted that the defendant in *McNeal* was not prejudiced by the technical violation within the indictment, due to his awareness of the charges and the indictment's compliance with Rule 2.05 of the Uniform Criminal Rules of Circuit Court Practice. *McNeal*, 658 So. 2d at 1350. Crawford's indictment meets the requirements of Rule 2.05, which is now revised as Uniform Circuit and County Court Rule 7.06 (1995). *See McNeal*, 658 So. 2d at 1349. There is nothing to indicate that Crawford objected to the indictment at any time before this appeal. Crawford's objection to the portion of the indictment charging him as an habitual offender is procedurally barred.

## XVIII. THE DEATH PENALTY IS DISPROPORTIONATE IN THIS CASE GIVEN THE EXTENT OF CRAWFORD'S MENTAL HEALTH PROBLEMS.

¶84. In all cases involving a sentence of death, Miss. Code Ann. § 99-19-105 (1994) requires this Court to determine "whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *See Irving v. State*, 361 So. 2d 1360, 1370 (Miss. 1978), *cert. denied*, 441 U.S. 913 (1979)(proportionality review involves comparison to other death penalty cases since *Jackson v. State*, 337 So. 2d 1242 (Miss. 1976)); *Gray v. State*, 472 So. 2d 409, 423 (Miss. 1985), *rev'd on other grounds*, 481 U.S. 648 (1987) (proportionality review insures that "such penalty is neither wanton, freakish, excessive, nor disproportionate").

¶85. Crawford contends that the fact that he suffered from extraordinary mental problems raises doubt as to whether his execution would be constitutional given the Eighth Amendment's prohibition against cruel and unusual punishment. *See Conner*, 632 So. 2d at 1265. Crawford urges this Court to follow the case of *Edwards v. State*, 441 So.2d 84 (Miss.1983), wherein the Court vacated a death sentence and remanded for imposition of a life sentence, with two justices being of the opinion that "there was no credible evidence in the record which would support any view other than that the defendant. . .was seriously mentally disturbed at the time of his crime." *Id.* at 97 (Robertson, J.,

joined by Prather, J., on sentence phase). This Court has held that Edwards is of no precedential value since it represents only a plurality vote. Conner, 632 So. 2d at 1265. Nevertheless, the defendant in Edwards suffered from an extensive history of paranoid schizophrenia. *Edwards*, 441 So. 2d at 93.

¶86. The Eighth Amendment does not categorically prohibit the execution of mentally retarded persons. *Jones v. State*, 602 So. 2d 1170, 1175 (Miss.1992). This Court has determined that mentally retarded persons may be subject to the death penalty under Mississippi law as well. Jones, 602 So.2d at 1175; Neal v. State, 451 So.2d 743, 762 (Miss. 1984), *cert. denied*, 469 U.S. 1098 (1984). In order to uphold a mentally retarded defendant's Eighth Amendment protection against cruel and unusual punishment, the jury must be provided a vehicle with which to consider and give effect to the mitigating evidence of his mental retardation in rendering its sentence. *Jones*, 602 So.2d at 1174.

¶87. Miss. Code Ann. § 99-19-101(6) (1994) sets forth the mitigating circumstances which the sentencing jury in death penalty cases must consider. Included are § 99-19-101(6)(b), "[t]he offense was committed while the defendant was under the influence of extreme mental or emotional disturbance," and § 99-19-101(6)(f), "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired." Pursuant to this statute, the jury in the case sub judice was instructed to consider these mitigating circumstances. The jury also heard extensive argument from defense counsel regarding Crawford's mental condition and its impact on these mitigating factors.

¶88. Dr. Martin Webb, a psychologist, testified that Crawford was a manic depressive, and that at the time of Kristy Ray's death, he probably was under extreme duress. He also testified that Crawford's capacity to appreciate the criminality of his conduct at the time of the commission of the crime was substantially impaired. Dr. Stanley Russel testified that Crawford was acting under extreme duress at the time of the crime. He also testified during the guilt phase that Crawford suffered from psychogenic amnesia, meaning that he had no recollection of killing Kristy Ray. Dr. Reb McMichael, on the other hand, testified that Crawford was not manic at the time of the crime. McMichael stated that based on the evidence available, Crawford was not substantially impaired as to his capacity to conform his conduct to the requirements of the law. Dr. Chris Lott, a clinical psychologist, testified that there was no evidence to suggest that Crawford ever suffered from manic depressive or bipolar disorder. He did state that he believed that Crawford knew right from wrong, and that the events from Crawford's childhood did not indicate a major mental disorder.

¶89. None of the experts testified regarding Crawford's IQ or his level of retardation, if any. The "battle of the experts" boils down to whether Crawford's emotional state at the time of the crime would preclude the imposition of the death penalty. In the recent *Wells* case, the State's expert, Dr. Donald Guild, testified that Wells's decision to stay at the crime scene for twenty to thirty minutes while the victim died and his subsequent decision to move the victim, bury him, and clean up the area were not consistent with a mental snap or true mental illness. *Wells*, 698 So. 2d at 515. Guild testified that he did not believe that Wells was under the influence of extreme mental or emotional disturbance. *Id.*

¶90. Here, Crawford behaved in a similar fashion, dragging Kristy Ray by her feet to hide her body in

a brush pile. Crawford covered her with leaves, because he wanted to hide the body. Then he sat at a nearby tree stump to decide what he would do. Once he got near his home, he sat on a hillside, watching patrol cars go back and forth, because he did not want anyone to see him. Because this factual scenario closely resembles that of the *Wells*, we find that the conclusion reached by the Court in *Wells* should apply here. This Court has determined "that Mississippi's sentencing scheme in death penalty cases, together with appropriate jury instructions and appropriate argument, satisfies the constitutional concern expressed above regarding mentally retarded defendants." *Wells*, 698 So. 2d at 515; *Jones*, 602 So.2d at 1174. This assignment of error is without merit.

## XIX. THE AGGREGATE ERROR IN THIS CASE REQUIRES REVERSAL OF THE CONVICTION AND SENTENCE.

¶91. This Court may reverse a conviction and sentence based upon the cumulative effect of errors that independently would not require reversal. *Jenkins*, 607 So. 2d at 1183-84; *Hansen*, 592 So. 2d at 153. However, where "there was no reversible error in any part, so there is no reversible error to the whole." *McFee v. State*, 511 So.2d 130, 136 (Miss.1987). Based on the conclusions made above with regard to the specific issues raised, we find that the assignments made by Crawford do not rise to the level of reversible error individually or in the aggregate.

## CONCLUSION

¶92. Pursuant to Miss. Code Ann. § 99-19-105(3)(1994), in addition to reviewing the merits of those issues raised by the defendant, this Court is required to determine:

> (a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;

> (b) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101; and

> (c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

¶93. Other capital murder cases decided by this Court, as set forth in the Appendix, have been reviewed and compared to the instant case. We find that the sentence of death in this case was not influenced by passion, prejudice or any other arbitrary factor. Further, the evidence supports the jury's findings of statutory aggravating circumstances as enumerated in Miss. Code Ann. § 99-19-105(5)(1994). Finally, the sentence of death in this case is neither excessive nor disproportionate to those cases in which such sentence has been imposed and upheld. Crawford's conviction of capital murder and sentence of death is supported by substantial evidence in the record. Crawford received a fundamentally fair trial. Therefore, we affirm Crawford's conviction and death sentence.

¶94. **COUNT I: CONVICTION OF BURGLARY OF AN INHABITED DWELLING AND SENTENCE OF 15 YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AS AN HABITUAL OFFENDER AFFIRMED. COUNT II: CONVICTION OF RAPE AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AS AN HABITUAL OFFENDER**

**AFFIRMED. SENTENCE IN COUNT II TO RUN CONSECUTIVE TO SENTENCE IN COUNT I AND TO SENTENCES IN CAUSE NUMBERS HK-93-022 AND LK-93-089. COUNT III: CONVICTION OF SEXUAL BATTERY AND SENTENCE OF 30 YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AS AN HABITUAL OFFENDER AFFIRMED. SENTENCE IN COUNT III TO RUN CONSECUTIVE TO SENTENCES IN COUNT I AND COUNT II AND TO SENTENCES IN CAUSE NUMBERS HK-93-022 AND LK-93-089. COUNT IV: CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH AFFIRMED. EXECUTION DATE TO BE SET WITHIN SIXTY DAYS OF FINAL DISPOSITION OF THIS CASE PURSUANT TO MISS. CODE ANN. § 99-19-105(7)(1996) AND M.R.A.P. 41(a).**

**PRATHER, C.J., PITTMAN, P.J., ROBERTS, SMITH, MILLS AND WALLER, JJ., CONCUR. BANKS, J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY PRATHER, C.J. SULLIVAN, P.J., NOT PARTICIPATING.**

### BANKS, JUSTICE, CONCURRING:

¶95. While I agree with the majority, I write separately to reiterate that extreme caution should be taken when admitting victim impact evidence in the penalty phase of a capital murder case.

¶96. In *Payne v. Tennessee*, 501 U.S. 808 (1991), the United States Supreme Court concluded that the Eighth Amendment did not bar the admission of victim impact evidence and prosecutorial argument of the same; however, *Payne* did not establish the blanket rule that all victim impact evidence is admissible, no matter its relevancy to the matter at hand.

¶97. The requirement that evidence be relevant to be admitted during trial -- guilt or sentencing -- is not novel. *See Miss. R. Evid. 402* ("All relevant evidence is admissible . . . Evidence which is not relevant is not admissible"). Rule 401 explains "relevant evidence" is that "evidence which has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Miss. R. Evid. 401*.

¶98. Given our decision in *Wilcher*, we must accept the proposition that victim impact evidence is relevant as for assisting the jury in resolving the issue before it -- deciding the appropriate sentence. *See Wilcher v. State*, 697 So. 2d 1087 (Miss. 1997) (approving the use of victim impact testimony during the sentencing phase of trial). It remains our law, nevertheless, that the admission of irrelevant evidence -- the purpose of which could only be to incite the jury, thereby causing the trier of fact to render a decision based upon arbitrary, impermissible factors -- is precluded. *See Snelson v. State*, No. 93-DP-00023-SCT, 1997 WL 688357, at *3-4 (Miss. Nov. 06, 1997) (finding evidence that defendant bought and used cocaine after he sold stolen guns irrelevant on the issue whether the defendant killed the victim and that such evidence was clearly inflammatory and offered for the sole purpose of improperly influencing the jury).

¶99. In *State v. Bernard*, 608 So. 2d 966, 970 (La. 1992), the Louisiana Supreme Court specifically

addressed whether evidence of the character of the victim or the impact of the crime on the victim's family is relevant to the jury's evaluation of the circumstances of the offense and the character and propensities of the offender, for purposes of determining the appropriate punishment. The court decided that such evidence is relevant; however, the court noted, "The more detailed the evidence relating to the character of the victim or the harm to the survivors, the less relevant [said evidence is to the ultimate issue before the jury]." *Id.* at 971. In other words, the more marginal the relevance of the evidence, the greater the risk that an arbitrary factor will be injected into the jury's sentencing deliberations.

¶100. Thus, the Louisiana court expressly warned against the introduction of "detailed descriptions of the good qualities of the victim or particularized narrations of the emotional, psychological and economic sufferings of the victim's survivors, which go beyond the purpose of showing the victim's individual identity and verifying the existence of survivors reasonably expected to grieve and suffer because of the murder." *Id.* at 972. In my view, that warning is appropriate and necessary to the proper administration of capital punishment.

¶101. Here, the testimony from the victim's mother treaded dangerously close to crossing that impermissible line recognized by Justice O'Connor in *Payne*. *Payne*, 501 U.S. at 831 (O'Connor, J., concurring). The mother's testimony, in some instances, approached impermissible "particularized narrations of the emotional, psychological and economic sufferings" she encountered due to her daughter's death. *Bernard*, 608 So. 2d at 972. For example, her decision to have the victim at a young age had no bearing whatsoever on the victim's unique identity, nor did it verify the existence of survivors reasonably expected to grieve and suffer because of Kristy's murder. The same can be said regarding the testimony about Kristy's grandparent. Moreover, the comments about marriage and grandchildren cannot be categorized as providing relevant information on Kristy's individual identity or verifying survivors because she was neither married nor a mother.

¶102. That said, I still am not persuaded that the victim impact evidence was so extensive as to implicate the Due Process Clause of the Fourteenth Amendment as interpreted by the *Payne* Court. The mother's testimony totaled less than six pages, and it was not as extensive as the victim impact evidence allowed in *Payne*. I, therefore, concur with the result reached by the majority on this issue. Nevertheless, I am compelled to reiterate that victim impact testimony should be limited to specific details concerning whether the victim left dependents, parents, or siblings, and should only provide a "quick glimpse" into the victim's life. *See Wilcher*, 697 So. 2d at 1121 (cautioning that should be limited to whether the victim left dependents, parents, or siblings, and provide a "quick glimpse" into the victim's life) (Banks, J., dissenting) (citing *Payne*, 501 U.S. at 830) (O'Connor, J., concurring). Otherwise, the danger of inciting the jury and causing a life or death decision to be made based upon arbitrary, irrelevant emotional factors is simply too great and offensive to the Due Process Clause.

**PRATHER, C.J., JOINS THIS OPINION.**

## APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Wells v. State*, 698 So. 2d 497(Miss. 1997)

*Wilcher v. State*, 697 So. 2d 1087(Miss. 1997)

*Wiley v. State*, 691 So. 2d 959 (Miss. 1997)

*Brown v. State*, 690 So.2d 276 (Miss. 1996).

*Simon v. State*, 688 So.2d 791 (Miss. 1997).

*Jackson v. State*, 684 So.2d 1213 (Miss. 1996).

*Williams v. State*, 684 So.2d 1179 (Miss. 1996).

*Davis v. State*, 684 So.2d 643 (Miss. 1996).

*Taylor v. State*, 682 So.2d 359 (Miss. 1996).

*Brown v. State*, 682 So.2d 340 (Miss. 1996).

*Blue v. State*, 674 So.2d 1184 (Miss. 1996).

*Holly v. State*, 671 So.2d 32 (Miss. 1996).

*Walker v. State*, 671 So.2d 581(Miss. 1995).

*Russell v. State*, 670 So.2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So.2d 1242 (Miss. 1995).

*Davis v. State*, 660 So.2d 1228 (Miss. 1995).

*Carr v. State*, 655 So.2d 824 (Miss. 1995).

*Mack v. State*, 650 So.2d 1289 (Miss. 1994).

*Chase v. State*, 645 So.2d 829 (Miss. 1994).

*Foster v. State*, 639 So.2d 1263 (Miss. 1994).

*Conner v. State*, 632 So.2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So.2d 114 (Miss. 1991).

*\*Shell v. State*, 554 So.2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990) reversing, in part, and remanding, *Shell v. State*, 595 So.2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So.2d 165 (Miss. 1989).

*Minnick v. State*, 551 So.2d 77 (Miss. 1989).

\**Pinkney v. State*, 538 So.2d 329 (Miss. 1989), *Pinkney v. Mississippi*, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990) vacating and remanding *Pinkney v. State*, 602 So.2d 1177 (Miss. 1992) remanding for new sentencing hearing.

\**Clemons v. State*, 535 So.2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) vacating and remanding, *Clemons v. State*, 593 So.2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So.2d 418 (Miss. 1988).


*Nixon v. State*, 533 So.2d 1078 (Miss. 1987).

*Cole v. State*, 525 So.2d 365 (Miss. 1987).

*Lockett v. State*, 517 So.2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So.2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So.2d 295 (Miss. 1987).

\**Jones v. State*, 517 So.2d 1295 (Miss. 1987), *Jones v. Mississippi*, 487 U.S. 1230, 108 S.Ct. 2891, 101 L.Ed.2d 925 (1988) vacating and remanding, *Jones v. State*, 602 So.2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So.2d 339 (Miss. 1986).

*Johnson v. State*, 477 So.2d 196 (Miss. 1985).

*Gray v. State*, 472 So.2d 409 (Miss. 1985).

*Cabello v. State*, 471 So.2d 332 (Miss. 1985).

*Jordan v. State*, 464 So.2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So.2d 727 (Miss. 1984).

*Billiot v. State*, 454 So.2d 445 (Miss. 1984).

*Stringer v. State*, 454 So.2d 468 (Miss. 1984).

*Dufour v. State*, 453 So.2d 337 (Miss. 1984).

*Neal v. State*, 451 So.2d 743 (Miss. 1984).

*Booker v. State*, 449 So.2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So.2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So.2d 806 (Miss. 1983).

*Irving v. State*, 441 So.2d 846 (Miss. 1983).

*Tokman v. State*, 435 So.2d 664 (Miss.1983).

*Leatherwood v. State*, 435 So.2d 645 (Miss.1983).

*Hill v. State*, 432 So.2d 427 (Miss. 1983).

*Pruett v. State*, 431 So.2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So.2d 576 (Miss. 1983).

*Evans v. State*, 422 So.2d 737 (Miss. 1982).

*King v. State*, 421 So.2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So.2d 229 (Miss. 1982).

*Smith v. State*, 419 So.2d 563 (Miss. 1982).

*Johnson v. State*, 416 So.2d 383 (Miss. 1982).

*Edwards v. State*, 413 So.2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So.2d 601 (Miss. 1980).

*Reddix v. State*, 381 So.2d 999 (Miss. 1980).

*Jones v. State*, 381 So.2d 983 (Miss. 1980).


*Culberson v. State*, 379 So.2d 499 (Miss. 1979).

*Gray v. State*, 375 So.2d 994 (Miss. 1979).

*Jordan v. State*, 365 So.2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So.2d 1236 (Miss. 1978).

*Irving v. State*, 361 So.2d 1360 (Miss. 1978).

*Washington v. State*, 361 So.2d 61 (Miss. 1978).

*Bell v. State*, 360 So.2d 1206 (Miss. 1978).


\* Case was originally affirmed in this Court but on remand from U.S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

# DEATH CASES REVERSED AS TO GUILT PHASE AND SENTENCE PHASE

*Lester v. State*, 692 So.2d 755 (Miss. 1997).

*Hunter v. State*, 684 So.2d 625 (Miss. 1996).

*Lanier v. State*, 684 So.2d 93 (Miss. 1996).

*Giles v. State*, 650 So.2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So.2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So.2d 894 (Miss. 1994).

*Butler v. State*, 608 So.2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So.2d 1171 (Miss. 1992).

*Abram v. State*, 606 So.2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So.2d 731 (Miss. 1992).

*Griffin v. State*, 557 So.2d 542 (Miss. 1990).

*Bevill v. State*, 556 So.2d 699 (Miss. 1990).

*West v. State*, 553 So.2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So.2d 389 (Miss. 1989).

*Mease v. State*, 539 So.2d 1324 (Miss. 1989).

*Houston v. State*, 531 So.2d 598 (Miss. 1988).

*West v. State*, 519 So.2d 418 (Miss. 1988).

*Davis v. State*, 512 So.2d 1291 (Miss. 1987).

*Williamson v. State*, 512 So.2d 868 (Miss. 1987).

*Foster v. State*, 508 So.2d 1111 (Miss. 1987).

*Smith v. State*, 499 So.2d 750 (Miss. 1986).

*West v. State*, 485 So.2d 681 (Miss. 1985).

*Fisher v. State*, 481 So.2d 203 (Miss. 1985).

*Johnson v. State*, 476 So.2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So.2d 45 (Miss. 1985).

*West v. State*, 463 So.2d 1048 (Miss. 1985).

*Jones v. State*, 461 So.2d 686 (Miss. 1984).

*Moffett v. State*, 456 So.2d 714 (Miss. 1984).

*Lanier v. State*, 450 So.2d 69 (Miss. 1984).

*Lahey v. State*, 421 So.2d 1216 (Miss. 1982).


## DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR RESENTENCING TO LIFE IMPRISONMENT

*Reddix v. State*, 547 So.2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So.2d 1341 (Miss. 1988).

*White v. State*, 532 So.2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So.2d 764 (Miss. 1987).

*Edwards v. State*, 441 So.2d 84 (Miss. 1983).

*Dycus v. State*, 440 So.2d 246 (Miss. 1983).

*Coleman v. State*, 378 So.2d 640 (Miss. 1979).


## DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR A NEW TRIAL ON SENTENCING PHASE ONLY

*Taylor v. State*, 672 So.2d 1246 (Miss. 1996).

\**Shell v. State*, 554 So.2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990) reversing, in part, and remanding, *Shell v. State*, 595 So.2d 1323 (Miss. 1992) remanding for new sentencing hearing.

\**Pinkney v. State*, 538 So.2d 329 (Miss. 1989), *Pinkney v. Mississippi*, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990) vacating and remanding, *Pinkney v. State*, 602 So.2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*__Clemons v. State__, 535 So.2d 1354 (Miss. 1988), __Clemons v. Mississippi__, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) vacating and remanding, __Clemons v. State__, 593 So.2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*__Jones v. State__, 517 So.2d 1295 (Miss. 1987), __Jones v. Mississippi__, 487 U.S. 1230, 108 S.Ct. 2891, 101 L.Ed.2d 925 (1988) vacating and remanding, __Jones v. State__, 602 So.2d 1170 (Miss. 1992) remanding for new sentencing hearing.

__Russell v. State__, 607 So.2d 1107 (Miss. 1992).


__Holland v. State__, 587 So.2d 848 (Miss. 1991).

__Willie v. State__, 585 So.2d 660 (Miss. 1991).

__Ladner v. State__, 584 So.2d 743 (Miss. 1991).

__Mackbee v. State__, 575 So.2d 16 (Miss. 1990).

__Berry v. State__, 575 So.2d 1 (Miss. 1990).

__Turner v. State__, 573 So.2d 657 (Miss. 1990).

__State v. Tokman__, 564 So.2d 1339 (Miss. 1990).

__Johnson v. State__, 547 So.2d 59 (Miss. 1989).

__Williams v. State__, 544 So.2d 782 (Miss. 1989); sentence aff'd. 684 So.2d 1179 (Miss.1996)

__Lanier v. State__, 533 So.2d 473 (Miss. 1988).

__Stringer v. State__, 500 So.2d 928 (Miss. 1986).


## DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR A NEW TRIAL ON SENTENCING PHASE ONLY


__Pinkton v. State__, 481 So.2d 306 (Miss. 1985).

__Mhoon v. State__, 464 So.2d 77 (Miss. 1985).

__Cannaday v. State__, 455 So.2d 713 (Miss. 1984).

__Wiley v. State__, 449 So.2d 756 (Miss. 1984); resentencing affirmed, __Wiley v. State__, 484 So.2d 339 (Miss. 1986), cert. denied __Wiley v. Mississippi__, 479 U.S. 1036 (1988); resentencing ordered, __Wiley v. State__, 635 So.2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to __Wiley v. Puckett__, 969 So.2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, __Wiley v. State__, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So.2d 798 (Miss. 1984).

* Case was originally affirmed in this Court but on remand from U.S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

1. Crawford claimed that he must have lost his revolver when he fell in the sinkhole.

2. All other pertinent facts will be discussed as they relate to the particular assignments of error asserted.

3. Pannell, after the trial judge told him that he had conducted sufficient voir dire regarding mitigating circumstances, said the following:

> You [sic] each telling me that you would do that. That you would listen to that to apply those. Of course you would be give instruction of law that you follow those instructions and not go off on what you believe the law ought to be but follow the law as the Court gives it to you. In terms of everything in this case. Not only the guilty phase and the penalty phase, *mitigation* and aggravation.

(emphasis added). When asked if any of the jurors thought they would have a problem following the law, none responded.

4. In his statement of issues, Crawford suggests that the error was in Julie Ann Cooper's testimony. However, within the brief, Crawford refers to the testimony of Lisa Forman. We will, therefore, analyze the testimony of Forman.

5. Since 1991, the National Research Council has issued a report in which it declared that saying two DNA patterns match without providing scientific data to support the statement is meaningless. *See Hull v. State*, 687 So. 2d 708, 728 (Miss. 1996). However, the National Research Council issued another report in 1996 which dismissed the claim that failure to account for population substructures made "product rule" statistics unreliable. *See Brim v. State*, 695 So. 2d 268, 270-275 (Fla. 1997).

6. In *Frye*, the court ruled:

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

*Frye*, 293 F. at 1014.