# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
November 22, 2024

Lyle W. Cayce
Clerk

No. 20-61019

Charles Ray Crawford,

*Petitioner—Appellant*,

*versus*

Burl Cain, *Commissioner, Mississippi Department of Corrections*;
Earnest Lee, *Superintendent, Mississippi State Penitentiary*,

*Respondents—Appellees*.

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 3:17-CV-105

Before Elrod, *Chief Judge*, and Jones, Smith, Stewart, Richman, Southwick, Haynes, Higginson, Willett, Ho, Duncan, Engelhardt, Oldham, Wilson, and Douglas, *Circuit Judges*.[*]

---

[*] Judge Graves is recused and did not participate in this decision. Judge Ramirez joined the court after the case was submitted and did not participate in this decision.

No. 20-61019

Per Curiam:

Charles Ray Crawford petitions for habeas relief. As a prisoner held pursuant to a state court judgment, Crawford must overcome the strictures of the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996. He cannot, so we affirm.

I

Crawford raped a 17-year-old girl. A Mississippi court convicted him and sentenced him to 46 years of imprisonment. The Mississippi Supreme Court affirmed on direct review. *See Crawford v. State*, 192 So. 3d 905 (Miss. 2015). Crawford sought state postconviction relief, arguing for the first time that the trial court violated his procedural due process right to expert assistance in asserting his insanity defense under *Ake v. Oklahoma*, 470 U.S. 68 (1985). The state supreme court held Crawford procedurally defaulted this claim because it "could have been raised in the direct appeal." ROA.3167. The court also denied Crawford's ineffective-assistance-of-counsel claims and found the rest of Crawford's claims to be "without merit." *Ibid.*

Crawford next filed a habeas petition in federal district court. The district court denied the petition but granted Crawford a certificate of appealability. Crawford timely appealed.

II

A

Crawford contends that his trial and direct-appeal lawyers provided constitutionally ineffective assistance in failing to preserve his *Ake* claim.

To establish ineffective assistance of counsel, Crawford must show that counsel's failure was both (1) objectively deficient and (2) prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *accord Evitts v. Lucey*, 469 U.S. 387, 396–97 (1985) (*Strickland* claims against direct-appeal counsel).

2

"*Strickland*'s first prong sets a high bar." *Buck v. Davis*, 580 U.S. 100, 118 (2017). There is "a strong presumption that counsel's representation was within the wide range of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quotation omitted).

Moreover, both claims were adjudicated on the merits in state court, so AEDPA's relitigation bar applies. *See* 28 U.S.C. § 2254(d). So Crawford must show the state court's adjudication of the claim "resulted in a decision that . . . involved an unreasonable application of[ ] clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). And because the Mississippi Supreme Court did not explain why it rejected Crawford's ineffective-assistance claims, we "must determine what arguments or theories . . . could have supported[ ] the state court's decision; and then [we] must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Richter*, 562 U.S. at 102.

Crawford cannot meet this demanding standard. We start with Crawford's direct-appeal lawyer, who failed to raise an *Ake* claim. "Declining to raise a claim on appeal . . . is not deficient performance unless that claim was plainly stronger than those actually presented to the appellate court." *Davila v. Davis*, 582 U.S. 521, 533 (2017). And "[i]n most cases, an unpreserved trial error will not be a plainly stronger ground for appeal than preserved errors." *Ibid.*; *see also Smith v. Robbins*, 528 U.S. 259, 288 (2000). Here, the state court found that trial counsel defaulted the *Ake* claim, and that Crawford's direct-appeal counsel did not violate the Sixth Amendment by failing to raise that unpreserved claim.

We cannot say that every fairminded jurist would disagree with the state court's decision. Crawford does not point to any record evidence that the state trial court ever denied a request under *Ake*; to the contrary, the trial

court expressly noted that its preliminary rulings on the matter were "without prejudice to further motions from either side for examination or for funds." ROA.2069. Crawford never filed a further motion and hence defaulted his *Ake* claim in the trial court. Crawford's direct-appeal lawyer did not violate the Sixth Amendment by failing to press the unpreserved *Ake* claim. And we cannot say the unpreserved *Ake* claim was "plainly stronger than those actually presented to the appellate court." *Davila*, 582 U.S. at 533. Much less can we say that all fairminded jurists of reason would reject the state court's resolution of this issue. Thus, Crawford's ineffective-assistance-of-appellate-counsel claim cannot surmount AEDPA.

Crawford next contends that his trial counsel violated the Sixth Amendment by failing to raise an *Ake* claim. This claim also fails to surmount AEDPA's relitigation bar for the reasons given by the district court in its careful and thorough opinion. *See* ROA.963–69. Moreover, by the time of Crawford's rape trial, a different jury had heard and rejected Crawford's insanity defense in a related assault trial. That effectively disproves prejudice under *Strickland*, *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and AEDPA.

*McWilliams v. Dunn*, 582 U.S. 183 (2017), is not to the contrary. That decision postdates the relevant state court decisions and hence cannot be used to push aside AEDPA's relitigation bar. *See, e.g.*, *Greene v. Fisher*, 565 U.S. 34, 38 (2011) ("[Section] 2254(d)(1) requires federal courts to focus on what a state court knew and did, and to measure state-court decisions against this Court's precedents *as of the time the state court renders its decision*." (quotation omitted)). And neither *McWilliams* nor *Ake* involved an unpreserved claim of constitutional error, an allegedly ineffective direct-appeal lawyer, or an insanity defense that had been rejected by the defendant's first jury.

In the absence of an ineffectiveness claim that can surmount AEDPA's relitigation bar, Crawford cannot show cause for defaulting his

*Ake* claim. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Davila*, 582 U.S. at 527. Crawford does not argue that another form of cause could apply. Therefore, the claim is defaulted and barred from review here.

B

The dissenting opinion offers a different understanding of facts that occurred more than 30 years ago. But AEDPA demands far more. The dissenting opinion cannot identify any case that found ineffective assistance of appellate counsel for failure to raise an unpreserved trial error. Nor does the dissenting opinion offer any non-conclusory contention that Crawford's unpreserved *Ake* claim was stronger—much less "*plainly* stronger"—than the claims his appellate counsel raised. *Davila*, 582 U.S. at 533 (emphasis added); *see also Robbins*, 528 U.S. at 288. Finally, the dissenting opinion relies heavily on a *post hoc* affidavit filed by Crawford's trial counsel James Pannell, which he wrote in 2015 (22 years after the trial) and filed for the purpose of helping Crawford's postconviction application. *Post*, at 13–16 (Richman, J., dissenting).

But that affidavit points to no then-existing evidence that counsel overlooked at the time of the trial; offers no theory (even with the benefit of 20/20 hindsight) for why it would have been a superior trial strategy to devote time and resources to undermining the competency and sanity evaluations performed at the Mississippi State Hospital in December 1992 and February 1993 rather than to pursue the "hybrid" strategy Pannell chose; and ignores the fact that trial counsel's "hybrid" strategy won Crawford an *acquittal* on one of the two charges he faced. That a defense strategy does not "work out as well as counsel had hoped" is not proof "that counsel was incompetent." *Richter*, 562 U.S. at 109. Much less is it proof that Crawford can overcome AEDPA's relitigation bar. And that presumably explains why the

No. 20-61019

dissenting opinion cannot identify a case granting habeas relief where trial counsel was as successful as Pannell was.

\*      \*      \*

AFFIRMED.

No. 20-61019

PRISCILLA RICHMAN, *Circuit Judge*, joined by SOUTHWICK, HIGGINSON, and DOUGLAS, *Circuit Judges*, dissenting:

I respectfully dissent because Crawford's trial counsel and direct appeal counsel were ineffective. Reasonably competent trial counsel and reasonably competent appellate counsel would have determined and diligently pursued the rights clearly established by the Supreme Court's longstanding precedent in *Ake v. Oklahoma*.[1] The Supreme Court held in 1985 that "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense."[2]

One of Crawford's defenses during the rape trial was that he periodically blacked out and did not remember if he had in fact raped the victim. There was testimony from the victim herself and a witness who was assaulted in tandem with the rape that Crawford's appearance changed at the time of the crime. His eyes became dilated, he stopped blinking, he had a blank stare, and he appeared scared.[3] Crawford relied on this and other evidence to present an insanity defense. But crucially and unlike the government, he did not have an expert either to assist his trial counsel in determining that Crawford suffered brain damage or to testify that

_____

[1] 470 U.S. 68 (1985); *see also McWilliams v. Dunn*, 582 U.S. 183, 186 (2017) (clarifying that *Ake* "clearly established" an indigent defendant's right to an expert "independent from the prosecution").

[2] *Ake*, 470 U.S. at 83.

[3] ROA.2543-46, 2594, 2599, 2605-06.

Crawford's behavior was consistent with brain damage and certain conditions flowing from it.

## I

The facts of this case are somewhat complicated. Crawford was tried for three serious crimes in Mississippi state courts. In one of those cases, Crawford was convicted of murder and sentenced to death.[4] That conviction is not before us. But Crawford's contentions regarding the murder impacted the proceedings in the state court as to the present conviction, which was for the rape of a seventeen-year-old victim identified as "Sue" in Crawford's direct appeal of the rape conviction[5] and as "K.R." in briefing before our court. Before the conviction in the present rape case, Crawford was also tried and convicted for the aggravated assault of Sue's companion, Nicole, during the course of events leading to Sue's rape.[6] Crawford hit Nicole over the head with a hammer.[7] Prior to trial in these two cases, Crawford indicated he intended to pursue an insanity defense.[8] He claimed that he experienced blackouts and did not remember assaulting Nicole or raping Sue. Crawford was evaluated for competency to stand trial in both cases.[9] Three days before Crawford's trial for the aggravated assault of Nicole was to begin, Crawford was arrested on January 30, 1993, for the murder of Kristy D. Ray the day before, January 29, 1993.[10] Crawford claimed that he experienced several

---

[4] *Crawford v. State*, 716 So. 2d 1028 (Miss. 1998).

[5] *See Crawford v. State*, 192 So. 3d 905, 907 (Miss. 2015).

[6] *See Crawford v. State*, 787 So. 2d 1236, 1238 (Miss. 2001).

[7] *Id.* at 1240.

[8] *Crawford*, 192 So. 3d at 909.

[9] *Id.*

[10] *Id.*

blackouts during the time he abducted and later killed Ray, and that he did not recall killing her.[11] As a consequence of these developments, Crawford was then again evaluated for competency to stand trial for the rape of Sue.[12] Crawford was evaluated at the Mississippi State Hospital.[13]

The trial court repeatedly declined to provide Crawford with a psychiatrist or other mental health care professional, other than a state expert, to evaluate Crawford and assist counsel in defending him, even though Crawford was indigent and that is what *Ake* required. Instead, the state trial court insisted that state experts must first evaluate Crawford to determine whether he "in fact[] has some mental deficiency" before the court would rule on the pending *Ake* motion.[14] In making proof of insanity a precondition to expert assistance, the trial court violated clearly established constitutional law. The *Ake* decision only requires a "threshold showing" that "[the defendant's] sanity is likely to be a significant factor in his defense."[15] In essence, the trial court gave the State the power to foreclose access to an expert witness for Crawford.

Trial counsel failed to pursue Crawford's rights diligently under *Ake* by failing to renew and pursue arguments in support of the *Ake* motion.[16] The state trial court declined to authorize funds for an expert, as required by *Ake*,

_____

[11] *See Crawford v. State*, 716 So. 2d 1028, 1034-35 (Miss. 1998).

[12] *See Crawford*, 192 So. 3d at 910.

[13] *Id.*

[14] ROA.2096; *see also* ROA.2069 ("I'm not going to spend $3,000 of Tippah County's money.").

[15] *Ake v. Oklahoma*, 470 U.S. 68, 82-83 (1985).

[16] *See Crawford v. Lee*, No. 3:17-CV-105-SA-DAS, 2020 WL 5806889, at *11 (N.D. Miss. Sept. 29, 2020).

on more than one occasion, continually deferring a ruling on the pending *Ake* motion. This was a violation of clearly established federal law.

Crawford's trial counsel failed to articulate and pursue the *Ake* claim even though he knew of facts that indicated possible brain damage and that Crawford had a history of seizures. Those facts and other facts regarding Crawford's history of mental health issues are detailed in Crawford's brief to the panel in this case, and in the interest of brevity, will not be repeated here.

Most importantly, before the rape trial commenced, Dr. Hutt stated in an affidavit that "these subsequent seizures could possibly be caused by organic brain damage resulting from a severe head injury he suffered in his late teens."[17] Dr. Hutt recommended further neurological testing,[18] explaining that an expert would have to perform that testing to properly evaluate whether Crawford had brain damage.[19]

Another expert, Dr. Webb, likewise told trial counsel, who was also Crawford's trial counsel for murder charges pending while the rape charges proceeded, that Webb believed Crawford "may suffer from organic brain damage."[20] Webb's affidavit stated, "I have informed Mr. Crawford's attorneys that a full psychological work-up of Mr. Crawford will not be complete until it is determined whether his various symptoms have caused or are the result of organic brain damage."[21] Webb's affidavit further said, "I strongly recommend that he undergo a neuropsychological battery to

---

[17] ROA.3009.

[18] ROA.3009.

[19] ROA.1043, 3009.

[20] ROA.3158.

[21] ROA.3159.

determine the existence and extent of any brain dysfunction."[22]  Because Webb's affidavit was prepared in March 1994, the federal district court discounted this affidavit, concluding that Webb did not give this advice to trial counsel until after the rape trial.  With great respect, that is not a fair reading of the affidavit.  The affidavit states Webb was retained by Crawford's sister in anticipation of his trial for capital murder, and the affidavit clearly states that Webb evaluated Crawford in April 1993.[23]  The assault trial commenced in May 1993.[24]  The rape trial  did not occur until August 1993.[25]  The murder trial commenced and the death penalty was imposed in April 1994.[26]  It strains reason to conclude that Webb waited until after the rape trial, which occurred months after he evaluated Crawford, to communicate his findings to counsel, who was the same person defending Crawford for the rape, aggravated assault, and murder charges in April 1993, well before the rape trial.  In any event, Dr. Hutt's advice to trial counsel alone was sufficient notice that further testing of Crawford by qualified professionals was required.

Trial counsel failed to heed the advice he received from these mental health experts, due to either ignorance of, or indifference to, *Ake*'s requirements.  In either case, trial counsel was objectively ineffective.  The insanity defense was pursued at the rape trial, without evidence that had some probability of persuading the jury to find in Crawford's favor.

_____

[22] ROA.3158.

[23] ROA.3157.

[24] *See Crawford v. Lee*, No. 3:17-CV-105-SA-DAS, 2020 WL 5806889, at *4 (N.D. Miss. Sept. 29, 2020).

[25] *See id.* at *4, *5.

[26] *See id.* at *5.

No. 20-61019

Despite Hutt and Webb's recommendation that Crawford undergo further neurological testing, it appears that Crawford did not receive an extended EEG until six days *after* being found guilty of rape.[27] The extended EEG revealed "unusual wave form" activity in Crawford's front lobe.[28] While Dr. Hutt was told that an EEG was performed prior to trial (but not shown the results), Dr. Russell, who was treating Crawford at the time and was a witness for the state at Crawford's rape trial, testified that an EEG had been scheduled before trial but was cancelled "for some reason."[29]

In fact, it took years for a qualified physician to conduct a full evaluation of Crawford. Nearly six months after the rape trial, Dr. Webb continued to "strongly recommend that [Crawford] undergo a neuropsychological battery," noting that "until such is done, it cannot be said that Mr. Crawford has had a complete psychological workup."[30] But this did not appear to happen until 2014 when Crawford began to prepare for state habeas proceedings.[31]

The majority opinion asserts that "by the time of Crawford's rape trial, a different jury had heard and rejected Crawford's insanity defense in a related assault trial."[32] To the extent Crawford's counsel mounted an insanity defense in the assault trial, the jury heard essentially the same, inadequately prepared and presented insanity defense. Neither jury heard

---

[27] ROA.1250, 3060.

[28] ROA.3060.

[29] ROA.3009, 1732-33.

[30] ROA.713.

[31] ROA.2492; Crawford Panel Br. at 51.

[32] *Ante* at 4.

the extensive evidence that was later developed and presented in Crawford's state habeas proceedings.

The state habeas record reflects that when Crawford was finally evaluated by experts qualified in neurology and related disciplines, his diagnosis supported evidence of his blackouts and behavior during the crime. I will not summarize or recast Crawford's briefing before the panel. Instead, I will largely include it wholesale:

> In the state habeas proceeding, Crawford presented a report and affidavit from the board-certified neurologist, Siddhartha Nadkarni, M.D., who specializes in the treatment and diagnosis of epilepsy at NYU Medical Center. ROA.2492, 2915. After conducting a comprehensive review of Crawford's records and social history, and a full in-person neurological examination, Dr. Nadkarni diagnosed Crawford with Severe Brain Injury and Partial Epilepsy. ROA.2492, 2920.
>
>> [Crawford's] neurological examination was grossly abnormal and revealed significant central nervous system injury with evidence of brain injury as well. Charles has had untreated and debilitating partial epilepsy from a very young age. He is severely brain injured from the epilepsy, repeated traumatic head injuries starting at a young age in a developing brain, and compounded by severe abuse and neglect as a child, and comorbid migraine headaches.
>
> ROA.2492.
>
> Dr. Nadkarni was also able to explain that the "spells" described to the jury were actually a sign of Crawford's untreated epilepsy:
>
>> Charles is described to have spells by several people independently that were close to him. The spells are remarkably stereotyped in their

occurrence and description, a hallmark of epileptic seizures. He is described to routinely in childhood and young adulthood to have these spells where he suddenly changes with dilation of the pupils, a glazed look, unresponsiveness, "like he's not here," a change in his voice, and even a change in the color of his skin. He generally does not look at the person he is talking to during these. . . . It seems he could have several spells in [a] short period and then really not recall what happened during that period and shortly thereafter, a well-documented phenomena called "post-ictal["] (after seizure(s)) amnesia. . . . These seizures are most likely "complex partial seizures," meaning they start in a restricted area of the brain and then spread enough to cause alteration in awareness and behavior. Complex partial seizures of temporal lobe origin can be very bland appearing and missed for seizures.

ROA.2917-18.

More importantly, Dr. Nadkarni was able to testify that Crawford's reported periods of blackouts and his inability to recall his actions constitute "a well-documented phenomenon called post-ictal amnesia," and that Crawford was "in a state of repetitive partial complex seizures on the day of the rape." ROA.2493. This was evident, in part, from the way K.R. and her friend described Crawford's appearance at the time of the crime:

Both girls stated that his eyes changed, he stopped blinking, and he had a fixed blank stare and a different look on his face that was not normal. They stated that he looked like a different person and looked at them differently in that he stopped blinking his eyes and just stared. One of the girls noted that his eyes were very

dilated. These are all class symptoms of seizure activity.

ROA.2493.

And most importantly, Dr. Nadkarni testified in his affidavit that Crawford's condition at the time of the crime met the legal standard for insanity:

> Charles was in an epilepsy related delirium . . . resulting from acute seizures and persistent post-ictal confusion in what was most probably a non-convulsive status epilepticus. As such, he would have had no awareness of his actions, nor agency in committing them. In other words, Charles was laboring under such a defect of reason from his seizure disorder that he did not understand the nature and quality of his acts at the time of the crime. He is a severely brain-injured man (corroborated both by history and his neurological examination) who was essentially not present in any useful sense due to epileptic fits at the time of the crime.

ROA.2494.

In addition to providing testimony on Crawford's mental state at the time of the crime, Dr. Nadkarni could have also rebutted the State's contention that Crawford had a personality disorder and was malingering his memory deficits. Brain deficits like Crawford's that affect "reasoning, problem solving, and judgment . . . can be perceived by lay persons as 'meanness' or antisocial behavior, but with expert evaluation and explanation are properly explained as deriving from disruption and impairments to the nervous system." *Anderson v. Sirmons*, 476 F.3d 1131, 1144 (10th Cir. 2007). Indeed, Dr. Webb strongly recommended neuropsychological testing to trial counsel because "if Mr. Crawford suffers from brain damage, this would effect [sic] that diagnosis . . . of Anti-Social

No. 20-61019

Personality Disorder. . . . Since certain types of brain damage decrease one's ability to control impulses, brain damage may factor into antisocial behavior." ROA.3158.

Dr. Nadkarni arrived at this precise conclusion through his evaluation of Crawford:

> Charles was diagnosed with a "Personality Disorder NOS," with antisocial, dependent, and explosive features. Actually he has an organic cause for his behavior in that he has had so many head injuries and a severe "Frontal Lobe Syndrome," with disinhibition in behavior, poor judgment, difficulty with executive functioning, impulsivity and aggression. The reason they gave the "NOS" or "not otherwise specified," is because he did not fall into a typical personality disorder, rather he had a frontal lobe syndrome from repetitive head injury. His personality features also were contributed to by his untreated partial epilepsy, leading to altered sexuality and memory difficulties. Uncontrolled seizures can affect one's memory, judgment, behavioral control as well. It can also lead to many psychiatric problems like mood disorders or psychosis.

ROA.2920.

However, because Pannell [trial counsel] failed to obtain this expert assistance, the State's incorrect assessment of Crawford went unchallenged and prevailed with the jury.[33]

Crawford's brief also asserts, and I agree, that:

> The trial court's denial of expert assistance clearly had a "substantial and injurious effect or influence" on the jury's

---

[33] Crawford Panel Br. at 51-54.

verdict because Crawford was left to rely on his own testimony and the testimony of two lay witnesses to present his insanity defense, while the State had the benefit of two expert witnesses who told the jury that Crawford was not mentally ill and was simply faking his memory deficits. Crawford's lay witnesses could not compete with the State's experts, especially because they could only describe symptoms, but lacked the expertise and education to diagnose Crawford or provide an explanation for his behavior and blackouts. ROA.1649, 1686-87, 1679, 1682. Most significantly, unlike the State's testing and examinations that counsel had been told were required, experts, they could not offer an opinion on whether Crawford met the standard for legal insanity because they lacked the expertise, and because the trial court explicitly forbade them from offering an opinion on the question. ROA.1648-49, 1686-87, 1678-79, 1682.[34]

Trial counsel's constitutional error unquestionably had a "substantial and injurious effect or influence" on the jury verdict.[35] As the Supreme Court observed in *Ake*, expert assistance is a "virtual necessity if an insanity plea is to have any chance of success."[36] That is particularly so here because the State relied on two experts to meet its burden of proving sanity and Crawford was denied "the raw materials integral to the building of an effective defense."[37] Nor did he have his own experts to assist with the cross-

---

[34] Crawford Panel Br. at 28-29.

[35] *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

[36] *Ake v. Oklahoma*, 470 U.S. 68, 81 (1985) (quoting Martin R. Gardner, *The Myth of the Impartial Psychiatric Expert—Some Comments Concerning Criminal Responsibility and the Decline of the Age of Therapy*, 2 Law & Psych. Rev. 99, 113-14 (1976)).

[37] *Id.* at 77.

examination of the State's experts.[38]  For example, Dr. Russell, an expert for the State, testified at trial that in his opinion, Crawford was "malingering," "faking or exaggerating symptoms of amnesia," and "symptoms of memory problems."[39]  In a case in which the Supreme Court held a state court's decision affirming a conviction was contrary to, or involved an unreasonable application of, *Ake*, the Court observed "[t]here is reason to think" the violation could have mattered because the trial judge, who was a factfinder at sentencing and imposed a death sentence, "relied heavily on his belief that [the defendant] was malingering."[40]  The Supreme Court continued, "[i]f [the defendant] had the assistance of an expert to explain that '[m]alingering is not inconsistent with serious mental illness,' [the defendant] might have been able to alter the judge's perception of the case."[41]  The neurological expert who presented evidence on behalf of Crawford in conjunction with his state habeas application, Dr. Nadkarni, addressed malingering.[42]  Crawford's trial counsel did not have an expert capable of providing such assistance before or during trial.

Further, trial counsel's fundamental misunderstanding of *Ake* forecloses any possibility that his failure to renew and pursue the *Ake* motion

---

[38] *Brown v. State*, 152 So. 3d 1146, 1165-67 (Miss. 2014) (quoting *Ake*, 470 U.S. at 77) (ruling that due process was violated where trial court denied defendant's *Ake* motion and prosecution relied solely on expert witness to show culpability).

[39] ROA.1760.

[40] *McWilliams v. Dunn*, 582 U.S. 183, 200 (2017).

[41] *Id.* (quoting Brief for American Psychiatric Association et al. as Amici Curiae Supporting Petitioner at 20).

[42] *See* ROA.2493-94 ("I am certain that Charles's memory deficits are credible and real, and are caused by his seizure disorder."); *see also* ROA.2918-19 (Dr. Nadkarni's evaluation).

was the sort of "strategic choice[]" that is "virtually unchallengeable."[43] This is because "[a]n attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*."[44]

Pannell, the substituted trial counsel in the 1993 rape case, confirmed that he misunderstood *Ake*, stating in a 2015 affidavit that he "did not renew [the original trial counsel's] motion for funds to hire an expert to conduct an independent psychiatric evaluation," because he mistakenly "did not see the point in requesting funds since it was [his] understanding and belief that the court would force [him] to use . . . the very same experts that would testify for the State."[45]  He clarified that the evaluation by Dr. Nadkarni is "precisely the type of expert testimony" that he would have used to present an insanity defense in the rape trial.[46]  Pannell's understanding of the law was plainly incorrect, and therefore deficient performance. As the Supreme Court has explained, *Ake* "clearly established that . . . the State must provide an indigent defendant with access to a mental health expert who is sufficiently available to the defense and *independent* from the prosecution."[47]  Pannell, mistakenly believing that he would not have access to an independent expert,

---

[43] *Strickland v. Washington*, 466 U.S. 668, 690 (1984).

[44] *Hinton v. Alabama*, 571 U.S. 263, 274 (2014).

[45] ROA.3165.

[46] ROA.3165.

[47] *McWilliams v. Dunn*, 582 U.S. 183, 186 (2017) (emphasis added).

proceeded with the "hybrid defense" that ultimately led to Crawford's conviction.[48]

Pannell's mistake of law is similar to other instances where this court and the Supreme Court have found deficient performance. Applying *Hinton*, this court found deficient performance where trial counsel failed to "conduct a mitigation investigation due to a misunderstanding of funding [limits] for habeas investigations."[49] Likewise, the Supreme Court found "deficient performance where counsel 'failed to conduct an investigation that would have uncovered extensive records [that could be used for death penalty mitigation purposes], not because of any strategic calculation but because they incorrectly thought that state law barred access to such records.'"[50]

The federal district court, whose reasoning the majority opinion incorporates, concluded that discussion of Pannell's affidavit and associated past errors "does little to aid or influence the decision in this case."[51] It is true that *Strickland* requires an "assessment of attorney performance" free of "the distorting effects of hindsight," one that instead focuses on "the conduct from counsel's perspective at the time."[52] However, this does not foreclose consideration of the legal error that Pannell made at the time.

---

[48] ROA.966.

[49] *Canales v. Stephens*, 765 F.3d 551, 569 (5th Cir. 2014).

[50] *Hinton v. Alabama*, 571 U.S. 263, 274 (2014) (quoting *Williams v. Taylor*, 529 U.S. 362, 395 (2000)).

[51] *Crawford v. Lee*, No. 3:17-CV-105-SA-DAS, 2020 WL 5806889, at *14 (N.D. Miss. Sept. 29, 2020).

[52] *Strickland v. Washington*, 466 U.S. 668, 689 (1984).

Pannell's admission that he did not understand the law in 1993 supports deficient performance under *Strickland* and *Hinton*.

In the present appeal, the majority opinion finds Pannell's post-conviction affidavit lacking for other reasons, but with great respect, these criticisms are straw men. Pannell's affidavit candidly admits that he did not know what *Ake* required.[53] This is discussed above in detail. That affidavit provides solid support for the ineffective-assistance-of-trial counsel claim in this regard. Nothing in the affidavit undercuts Pannell's ineffectiveness.

The majority opinion says the "affidavit points to no then-existing evidence that counsel overlooked at the time of the trial."[54] However, the relevance of the affidavit was that there was then-existing, well-established federal law of which counsel was unaware and made no effort to find or study.

The majority opinion next says the affidavit "offers no theory (even with the benefit of 20/20 hindsight) for why it would have been a superior trial strategy to devote time and resources to undermining the competency and sanity evaluations performed at the Mississippi State Hospital in December 1992 and February 1993 rather than to pursue the 'hybrid' strategy Pannell chose."[55] With great respect, I do not see the logic of this argument. Pannell pursued an insanity defense at trial. He relied heavily upon it. But he had no expert witness at trial, not one, while the "competency and sanity evaluations performed at the Mississippi State Hospital" concluded that Crawford was malingering and was not truthful about his blackouts, and more to the point, that Crawford knew exactly what

---

[53] ROA.3165.

[54] *Ante* at 5.

[55] *Ante* at 5.

he was doing when he raped Sue.[56] It is difficult to comprehend how it could have been a "superior trial strategy" to accept the State's evaluations and, at the same time, hinge Crawford's defense of the rape charge primarily on an insanity defense. Pannell's failure to understand *Ake* was not a trial strategy. It was an indefensible failure to perform as competent counsel.

The majority opinion says the affidavit "ignores the fact that trial counsel's 'hybrid' strategy won Crawford an *acquittal* on one of the two charges he faced," and that "the dissenting opinion cannot identify a case granting habeas relief where trial counsel was as successful as Pannell was."[57] I measure success quite differently. Pannell was unsuccessful in defending Crawford in the assault case that was tried before the rape case, and he was unsuccessful in defending Crawford in the murder case, in which the insanity defense was presented without the kind of expert testimony that was later developed in the state habeas proceeding in the rape case. But most importantly, the majority opinion cites no case, and I submit cannot cite a case, for the proposition that if trial counsel obtains an acquittal of one charge during a trial, that forecloses any possibility of habeas relief based on ineffective-assistance-of-counsel as to another charge on which the defendant was convicted. That is nowhere to be found in our habeas jurisprudence.

The majority opinion also misapprehends the nature of Crawford's defenses against each charge. The jury acquitted Crawford on the kidnapping charge because the evidence raised a reasonable doubt as to whether the victim was actually kidnapped. Sue was the younger sister of

---

[56] ROA.1760; *see also* Crawford Panel Br. at 15 ("Without any expert witnesses, Crawford relied on his own testimony and the lay testimony of his mother, Johnnie Smith, and ex-wife, Gail Crawford, to present the insanity defense.").

[57] *Ante* at 5-6.

Crawford's ex-wife Janet.[58]  Immediately after the rape occurred, Crawford was remorseful, handed his gun to Sue, and asked her to kill him.[59]  She did not, and they began a journey to another state to see Janet.[60]  They were driven by another couple for some distance, who thought Crawford and Sue were romantically involved.[61]  Another individual then drove them further and took them to a hotel room, where Crawford and Sue spent the night.[62]  The next day, they were driven to a pay phone so Sue could call Janet to tell her about the rape, which Sue did, and they were driven to a place where Crawford could call the police and turn himself in, which he did.[63]  Throughout many of these events, Sue had kept the gun.[64]  As the federal district court explained, the victim (Sue) "verbally indicated" that she would cross state lines with Crawford, had "opportunities to escape or ask for help," and may not have "appear[ed] distraught."[65]

Moreover, Crawford did not claim he had blackouts during the kidnapping episode, which spanned across two days.[66]  In response to questions about the alleged rape, Crawford asserted,

---

[58] ROA.1544.

[59] ROA.1557-59.

[60] ROA.1560.

[61] ROA.1563, 1624-26.

[62] ROA.1564-66.

[63] ROA.1566-69, 1715-16.

[64] ROA.1582-84, 1586-87, 1589, 1629, 1712.

[65] *Crawford v. Lee*, No. 3:17-CV-105-SA-DAS, 2020 WL 5806889, at *14 (N.D. Miss. Sept. 29, 2020).

[66] ROA.1560-69 (describing the alleged kidnapping as having begun one day and having ended the next day).

"I can't honestly say that I didn't [rape the victim], and I can't sit here and tell you that I did. The only thing that I've got to go by is what she said. I'm not going to lie and say I didn't, and I'm not going to turn around and lie and say that I did, because I don't know.[67]

By contrast, he "remember[ed]" himself and the alleged kidnapping victim "leaving in [his] truck and starting to Memphis" and that he had "told her that [he] needed to go to Memphis . . . and [had] asked her if she wanted to go with [him]."[68]

The evidence as to whether Crawford raped Sue was vastly different. She testified that he covered her mouth with tape and then bound her hands behind her back with tape.[69] He then forcibly raped her without her consent, according to Sue, while she was still bound, though she managed to lick the tape around her mouth and tried to dissuade him from the sexual assault.[70] Authorities found tape with Sue's hair on it when they investigated, as well as other physical evidence that corroborated her account of events.[71] Crawford testified at trial that he did not remember raping Sue but could not say that he did not rape her.[72] Sue also testified about hearing "a noise" while she was bound and while Crawford had left her alone.[73] After the rape, when Crawford took her back to the vehicle they arrived in with Nicole, Sue

---

[67] ROA.1703; *see also* ROA.1718.

[68] ROA.1704; *see also* ROA.1718.

[69] ROA.1554.

[70] ROA.1555-56.

[71] *See, e.g.*, ROA.1531-33, 1610.

[72] ROA.1702-03.

[73] ROA.1557.

asked where Nicole was.[74] Crawford did not say, but Sue saw a hammer in Crawford's hand.[75] This was consistent with Nicole's being hit in the head by a hammer while she was waiting in the vehicle for Crawford and Sue to return from his home. The evidence that Crawford raped Sue was overwhelming and virtually uncontested. His defense at trial depended on the insanity defense. His defense to the kidnapping charge was in a far different posture and depended on whether Sue was actually kidnapped.

The record thus shows that Crawford's acquittal on the kidnapping charge speaks not to the strategic soundness of the hybrid defense but rather to the weakness of the facts underlying that charge. That acquittal, then, cannot rebut the claim of Pannell's deficient performance regarding Crawford's rights under *Ake*, which, ultimately, supplies the basis for the habeas relief that Crawford seeks here.

The state habeas court's rejection of Crawford's ineffective-assistance-of-trial-counsel claim was "contrary to, or involved an unreasonable application of, clearly established Federal law"[76] because it failed to recognize what *Ake* itself clearly established. As the Supreme Court explained in *McWilliams*, "[*Ake*] requires the State to provide the defense with 'access to a competent psychiatrist who will conduct an appropriate [1] *examination* and assist in [2] *evaluation*, [3] *preparation*, and [4] *presentation* of the defense.'"[77] The Court explained that "[n]either [a state expert] nor any other expert helped the defense prepare and present arguments that might,

---

[74] ROA.1558.

[75] ROA.1558.

[76] 28 U.S.C. § 2254(d)(1).

[77] *McWilliams v. Dunn*, 582 U.S. 183, 198 (2017) (quoting *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985)) (emphases in original).

for example, have explained that [the defendant's] purported malingering was not necessarily inconsistent with mental illness (as an expert later testified in postconviction proceedings)."[78]  The Supreme Court held that "[s]ince Alabama's provision of mental health assistance fell so dramatically short of what *Ake* requires, we must conclude that the Alabama court decision affirming McWilliams'[s] conviction and sentence was 'contrary to, or involved an unreasonable application of, clearly established Federal law.'"[79]  In the present case, trial counsel's failure to understand what *Ake* plainly required was clearly ineffective assistance, it was prejudicial to Crawford's defense, and the state habeas court's failure to recognize this was contrary to, or involved an unreasonable application of, clearly established federal law.

## II

Crawford's appellate counsel was also ineffective.  The facts regarding Crawford's mental health struggles and blackouts were in the record.  Trial counsel's failure to pursue an unmistakable right under *Ake* to assistance from a qualified mental health care expert was also glaringly apparent from the record.  There was no strategic reason for failing to pursue an *Ake* failure-to-fund claim on direct appeal.  To the contrary, appellate counsel affirmatively averred that the failure to pursue the claim was an oversight.  Here are excerpts from his affidavit that make this clear:

> 8. During my review of Mr. Crawford's case, I was asked to give an affidavit for a petition for post-conviction relief in Mr. Crawford's capital case. In that affidavit, I pointed out a number of errors that I had preliminarily identified that I believed could be meritorious on appeal, including but not

---

[78] *Id.* at 199.

[79] *Id.* (quoting 28 U.S.C. § 2254(d)(1)).

limited to the denial of funding for an expert witness for Mr. Crawford on his claim of insanity.

9. During the course of writing the brief in the direct appeal of Mr. Crawford's rape conviction, I became so focused on the issues I ultimately raised that I overlooked the issue regarding the denial of expert funding and failed to raise it on direct appeal.

10. I had no strategic reason for not raising the denial of expert funding issue in the direct appeal of Mr. Crawford's his [sic] rape conviction. It was an oversight on my part, and it was not intentionally left out of Mr. Crawford's direct appeal for any reason, strategic or otherwise.

11. During oral argument before the Mississippi Supreme Court on the direct appeal of Mr. Crawford's rape conviction, I first realized that I had failed to raise the denial of expert funding issue on direct appeal through an oversight on my part even though I believed the issue to be meritorious. I was stunned, but it was too late to raise it at that juncture of the direct appeal proceedings.

12. I devoted my full effort and professional skills in my representation of Mr. Crawford in the direct appeal of his rape conviction. I am extremely upset and embarrassed that I failed to raise the denial of expert funding issue on direct appeal.

13. My failure to raise the issue of the denial of expert funding on direct appeal was not an attempt to create a claim of ineffective assistance of appellate counsel. Such an attempt would be unethical and dishonest. Such an attempt would also not have been in Mr. Crawford's best interest because in my opinion getting relief on the claim would be more difficult in the context of an ineffective assistance of appellate counsel

claim in post-conviction proceedings than by properly raising it on direct appeal.[80]

The majority opinion maintains that appellate counsel failed to raise Crawford's *Ake* claim on appeal because it was unpreserved.[81] But Crawford persuasively argues it was not. Confusion on this point arises because trial counsel withdrew the *Ake* motion in Crawford's *aggravated assault* case, but he did not do so in the rape case. Counsel stated that "[i]n case 5779 that's a moot question at this point" when the trial court asked about the motion to provide funds for expert assistance.[82] As the State admits in its brief, the trial court never issued an order denying the expert funding motion as withdrawn, moot, or otherwise.[83] And as noted in appellate counsel's affidavit above, he did not press the *Ake* claim on appeal because he thought it was withdrawn—he did so because of an "oversight." Counsel's sworn statement that the failure to bring the *Ake* claim on appeal was an oversight supports the conclusion that his failure to raise the issue was objectively unreasonable.

Even if the *Ake* claim were unpreserved, however, it was plainly a stronger ground for appeal. It is true both that "[d]eclining to raise a claim on appeal . . . is not deficient performance unless that claim was plainly stronger than those actually presented to the appellate court," and that "[i]n *most* cases, an unpreserved trial error will not be a plainly stronger ground for appeal than preserved errors."[84]

---

[80] ROA.2496-97.

[81] *Ante* at 3-4.

[82] ROA.1392.

[83] Cain Panel Br. at 33.

[84] *Davila v. Davis*, 582 U.S. 521, 533 (2017) (emphasis added).

But, as the Seventh Circuit has observed, "'most' does not mean 'all.'"[85] Here, as noted above, the trial court misapplied *Ake* by essentially giving the State the power to foreclose access to an expert witness for Crawford by making proof of insanity a precondition to expert assistance. This was an obvious misapplication of *Ake*, which requires only a "threshold showing" that "[the defendant's] sanity is likely to be a significant factor in his defense."[86] As the Mississippi Supreme Court has observed, plain-error review "will allow an appellate court to address an issue not raised at trial if the record shows that error did occur and the substantive rights of the accused were violated."[87] That court has also observed that "[p]lain-error review is properly utilized for 'correcting obvious instances of injustice or misapplied law.'"[88] Because the trial court obviously misapplied *Ake*, Crawford had a strong argument for relief even under plain-error review. Counsel's failure to raise *Ake* on appeal was objectively unreasonable.

## III

Section 2254(d) of the Antiterrorism and Effective Death Penalty Act does not bar federal habeas relief on Crawford's ineffective assistance claims.[89] While the Mississippi Supreme Court adjudicated these claims on the merits,[90] that court unreasonably applied clearly established law, as

---

[85] *Ramirez v. Tegels*, 963 F.3d 604, 617 (7th Cir. 2020) (affirming habeas relief for ineffective assistance of appellate counsel who failed to raise Confrontation Clause claim even assuming the claim was unpreserved).

[86] *Ake v. Oklahoma*, 470 U.S. 68, 82-83 (1985).

[87] *Byrom v. State*, 863 So. 2d 836, 872 (Miss. 2003).

[88] *Smith v. State*, 986 So. 2d 290, 294 (Miss. 2008) (quoting *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 256 (1981)).

[89] *See* 28 U.S.C. § 2254(d)(1).

[90] ROA.3167.

No. 20-61019

determined by the Supreme Court of the United States. Crawford had a clearly established right to the effective assistance of counsel, both at trial and during his first appeal as of right.[91] And *Ake* "clearly establishe[d]" that when an indigent defendant "'demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial,' . . . a State must provide a mental health professional capable of . . . 'conduct[ing] an appropriate examination and assist[ing] in evaluation, preparation, and presentation of the defense.'"[92]

As noted by the majority opinion, the Mississippi Supreme Court did not explain why it rejected Crawford's ineffective assistance claims.[93] Thus, we "must determine what arguments or theories . . . could have supported[] the state court's decision" and whether "fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court.[94]

The federal district court suggested that trial counsel affirmatively decided not to pursue the *Ake* motion for funding in the state trial court.[95] The federal district court also concluded that the state trial court never actually denied the motion for funding but instead, deferred it repeatedly,

_____

[91] *See Strickland v. Washington*, 466 U.S. 668, 685-86 (1984); *Evitts v. Lucey*, 469 U.S. 387, 393-94 (1985).

[92] *McWilliams v. Dunn*, 582 U.S. 183, 187 (2017) (quoting *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985)).

[93] *Ante* at 3.

[94] *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

[95] *See Crawford v. Lee*, No. 3:17-CV-105-SA-DAS, 2020 WL 5806889, at *11 (N.D. Miss. Sept. 29, 2020) ("Pannell told the court he was seriously considering defending both the rape and kidnapping charges on the facts and withdrawing the insanity defense completely. [] Both the record and Pannell's affidavit indicate that he never renewed the motion for funds as to the rape and kidnapping charge.").

30

before Crawford's trial counsel decided to forego further pursuit of *Ake* funding.[96]  No one, including the State, and the federal district court, with great respect, has offered a reasoned explanation as to why trial counsel was not ineffective for abandoning a request for funding expert assistance, to which Crawford was clearly entitled under *Ake*.  What possible explanation is there for trial counsel's decision to present an insanity defense without insisting on funding for expert evaluation of Crawford to determine if he suffered from brain damage, as suspected by experts who did evaluate Crawford but who, by their own admissions, were not qualified to assess brain damage?  Why would counsel fail to insist on Crawford's rights under *Ake* to obtain expert assistance to trial counsel in deciding how to best defend Crawford in light of the questions raised about brain damage, seizures, and blackouts?  I have seen no explanation, whatsoever, in this record that would support a debate among reasonable jurists as to whether counsel was ineffective.

As to appellate counsel's ineffectiveness on direct appeal, failing to raise the *Ake* funding issue excused the procedural default of that issue before the Mississippi Supreme Court.[97]  But regardless of that procedural default, Crawford is not barred from bringing his ineffective-assistance-of-trial-counsel claim.  State habeas counsel raised the ineffective-assistance-of-trial-counsel claim at the first opportunity, which was in state habeas court proceedings.  State habeas counsel made a full record on what expert evaluation would have revealed and what testimony could have been

---

[96] *Id.*

[97] *See, e.g.*, *Murray v. Carrier*, 477 U.S. 478, 488 (1986) ("[I]f the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State . . . ."); *Busby v. Dretke*, 359 F.3d 708, 718 (5th Cir. 2004) ("Ineffective assistance of counsel is sufficient 'cause' for a procedural default.").

No. 20-61019

presented at trial had trial counsel been effective.  Appellate counsel on direct appeal could not have made such a record or raised ineffective assistance of trial counsel.

I would grant habeas relief.